298 A.2d 121.

MINARD PRICE *vs.* RETIREMENT BOARD OF THE STATE OF RHODE ISLAND.

DECEMBER 29, 1972.

PRESENT: Roberts, C. J., Paolino, Powers, Joslin and Kelleher, JJ.

KELLEHER, J.  This is common-law certiorari.  We have issued the writ so that we can review the respondent's denial of the petitioner's application to purchase certain retirement credits covering a period of time he spent with the Civilian Conservation Corps.  The interval in question begins in April, 1934 and ends in September, 1940, a span of approximately six and one-half years.  Hereafter, we shall refer to the petitioner as "Price," the respondent as the "board" and the Civilian Conservation Corps as the "Corps" or the "CCC."  The records which have been certified to us serve as a reminder of some of the not so good old days of our Nation's history.

On March 28, 1934, Price was notified of his appointment as a "Camp Educational Adviser" to the Corps at an annual salary of $1,980.  Price's salary was not to be payable until he reported for duty to the commander of the camp to which he was assigned.  He spent his first two years in Rhode Island being stationed in Charlestown at Camp Burlingame.  Price was then transferred to Connecticut where he stayed for the next four years.  On April 25, 1940, the "Educational Adviser" for the Army's First Corps wrote to Price and commended him for the excellent educational progress made by the personnel of Company 179, the unit within Price's area of responsibility.

Price's association with the CCC ended on this happy note.  In September, 1940 he was appointed as a teacher in the Warwick school system and subsequently became a member of the employees' retirement system of the State of Rhode Island pursuant to the appropriate provisions of G. L. 1956, ch. 16 of title 16.

A teacher, who has attained the age of 60 and completed at least ten years of service, may as the result of several amendments made through the years to §16-16-12 retire and receive a pension called a "service retirement allowance."  The amount of pension varies depending, of course,

on the teacher's years of service. In the spring of 1970, Price filed an application with the board in which he sought to purchase retirement credit for the interval he was assigned to the CCC. The executive director of the retirement system informed Price that his application was denied. Price sought and received a hearing before the board. The board has affirmed the executive director's action.[1]

Price rests his claim to have his teaching experience with the CCC added to his 32 years of teaching service in the Warwick schools upon the provisions of §16-16-6 as it read when he first filed his application.[2] In pertinent part this section provided that in determining the years of service which may be considered in computing the amount of a "service retirement allowance" to be paid a retired teacher, there can be added a period of time not to exceed ten years during which he or she served as a teacher or acted in a similar capacity in any one or combination of the following three circumstances:

1. In public schools outside Rhode Island.
2. In nonprofit private schools or institutions in or outside Rhode Island.
3. In public schools within Rhode Island where the teacher was paid by funds of the United States Government.

Price, in urging that the board erred, places great emphasis on the uncontroverted fact that during his entire tenure with the CCC his salary was paid by the federal

[1]The board has informed us that Price retired in June, 1972. He was 66 at the time of his retirement and is entitled to an annual service allowance of $7,376. If his bid to purchase credits for his years in government service proved successful, his annual allowance would be increased to $9,106.

[2]This section was changed by the General Assembly during its January, 1970 session. All parties have agreed that the modifications are not applicable to Price's application.

government. What he overlooks is the crucial phrase "public schools." If the CCC can be declared a "public school," Price should be allowed to make the necessary monetary contribution to the retirement fund and thereby increase his annual pension by adding to his years of service the time spent with the federal organization. If his superior officer's laudatory communication of April 25, 1940 is any indication, it was time well-spent.

School is a word with many connotations. It has been defined as an institution consisting of teachers and pupils, irrespective of age, gathered together for instruction in any branch of learning the arts or sciences. *Weisse v. Board of Education*, 178 Misc. 118, 32 N.Y.S.2d 258 (1941). Long ago, this court said that where the state's statutes refer to "public schools," these two words describe schools which are "established, maintained, and regulated" under the statute laws of Rhode Island. *St. Joseph's Church v. Assessors of Taxes*, 12 R. I. 19 (1878). Public schools are thought of as institutions of learning for the young while institutions designed for education beyond the secondary school level are not usually considered as being part and parcel of the public school system. *Benvenue Parent Teacher Ass'n v. Nash County Board of Education*, 4 N.C.App. 617, 167 S.E.2d 538 (1969). We believe that the General Assembly in making available retirement credits to an individual described in §16-16-6 intended that his public school teaching efforts be made in a tax-supported institution whose main purpose was the diffusion of knowledge by its faculty to the student body on a schedule approximating a five-day week over an interval comparable to the 180-day school year mandated by the law of this state. Section 16-2-2. The Corps does not come within the ambit of the statute.

The CCC was first established under the provisions of the Unemployment Relief Act, 1933, ch. 17, 48 Stat. 22.

This legislation authorized the President to use such existing departments and agencies as he might designate to provide work for the unemployed "* * * in the construction, maintenance and carrying on of works of a public nature in connection with the forestation of lands belonging to the United States or to the several States which are suitable for timber production, the prevention of forest fires, floods and soil erosion, plant pest and disease control, the construction, maintenance or repair of paths, trails and fire-lanes * * *." Four years later, on June 28, 1937, Congress formally recognized the existence of the CCC with the passage of the Civilian Conservation Corps Act, ch. 383, 50 Stat. 319. Even though this legislation contained a provision that at least ten hours each week might be devoted to "general educational and vocational training," it is clear that the basic purpose of the Corps was to provide employment in the public works area by restoring and conserving the Nation's natural resources. With the exception of war veterans and Indians, enrollment in the Corps was limited to unemployed, unmarried and needy male citizens of the United States, between the ages of 17 and 23. The initial enrollment period was for six months. The total period of one's enrollment could not exceed two years. The enrollee in the lowest pay bracket received a monthly pay of $30.

Nobody disputes the academic achievements attained by Price as he sought to improve the intellectual ability of the enrollees submitted to his charge. It just cannot be said that his educational efforts were expended in a public school —in a federal governmental agency, yes, but in a public school, no. If Price's efforts could be described as having been performed in a public school, then all teachers in the retirement system who at one time or another might have taught at any of the military installations located throughout the United States, wherein their expertise covered such

diverse subjects as Military Courtesy, Fire Prevention, Rules of the Road, Aircraft Recognition, or Navigation, could follow the route taken by Price and increase their total amount of creditable service. It is obvious that neither their labors nor those of Price were within the legislative intendment when the General Assembly enacted §16-16-6.

In conclusion, if one were to ask a former member of the CCC if his educational experiences with that organization were synonymous with his "public school" experiences, his reply would only provide added support to the board's denial of price's application.

The petition for certorari is denied and dismissed, the writ heretofore issued is quashed and the records are returned to the State Retirement Board with our decision endorsed thereon.

*Gordon C. Mulligan,* for petitioner.

*Richard J. Israel,* Attorney General, *George H. Egan,* Special Asst. Attorney General, for respondent.