653 A.2d 506

**SUGARLOAF CITIZENS' ASSOCIATION et al.**

v.

**DEPARTMENT OF the ENVIRONMENT, et al.**

No. 703, September Term, 1994.

Court of Special Appeals of Maryland.

Feb. 7, 1995.

**270**

Richard E. Conit (Mick G. Harrison, on the brief), Washington, DC, for appellants.

Ann Marie DeBiase, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., Denise Ferguson–Southard and Jeffrey E. Howard, Asst. Attys. Gen., on the brief), Baltimore, for appellee, Dept. of Environment.

Deborah E. Jennings (Roger D. Redden, Gina M. Zawitoski and Piper & Marbury, on the brief), Baltimore, for appellee Northeast.

Joyce R. Stern, County Atty., A. Katherine Hart, Sr. Asst. County Atty. and Diane R. Schwartz Jones, Associate County Atty., on the brief, Rockville, for appellee, Montgomery County, MD.

Argued before WILNER, C.J., and ALPERT and SALMON, JJ.

WILNER, Chief Judge.

This appeal is the latest event in a long struggle by certain residents in the Dickerson area of Montgomery County, joined by a number of organizations, to prevent the county from proceeding with the construction of a "resource recovery facility" (RRF)—a power-generating solid waste incinerator. This phase involves the issuance of air quality construction and refuse disposal permits by the Maryland Department of the Environment (MDE), allowing construction to proceed.

Appellants sought judicial review of the administrative action in the Circuit Court for Montgomery County. That court dismissed their petitions upon a finding that none of the appellants had legal standing to contest the permits. We are concerned here with the correctness of that finding, in particular whether the court erred in determining that (1) the Audubon Naturalist Society, the Izaac Walton League, and the individual appellants lacked common law standing, and (2) all appellants lacked standing under the Maryland Environmental Standing Act (MESA). We find no error in the court's rulings and shall affirm.

## BACKGROUND

Md.Code Envir. art., § 9–503 requires each county to adopt a 10–year plan dealing, among other things, with solid waste acceptance facilities and disposal systems. The plan must provide for facilities that are adequate to treat, recover, or dispose of solid waste in a manner consistent with State law relating to air and water pollution and land use. *Id.* at § 9–505(a)(5). Pursuant to that requirement, discussions, planning, and hearings with respect to an RRF began in 1982. Plans to construct such a facility at the Dickerson site commenced in 1987. The site chosen is a 35–acre tract purchased by the county from Potomac Electric Power Company (PEPCO). It is more or less in the middle of a much larger tract, of about 1,000 acres, owned by PEPCO, upon which that utility presently operates two coal-fired electric generating plants.

In 1988, the county and the North East Maryland Waste Disposal Authority applied to MDE for a Prevention of Significant Deterioration (PSD) approval. Three of the appellants in this appeal—Sugarloaf Citizens Association and two individual landowners—protested and insisted that MDE conduct a contested case (adjudicatory) hearing under the Administrative Procedure Act before ruling on the application. When MDE rejected that demand in favor of a more general public comment hearing, those appellants filed an action in the Circuit Court for Baltimore City, seeking a declaratory judgment that an adjudicatory hearing was necessary.

The appellants lost that case. In *Sugarloaf Citizens Association v. Northeast Waste Disposal,* 323 Md. 641, 594 A.2d 1115 (1991), the Court held that, although an adjudicatory hearing would, on demand, be required in connection with an application for a construction permit, one was not required with respect to a PSD approval. In light of that conclusion, the Court declined to consider whether the individual appellants lacked standing to bring the declaratory judgment action. *Id.* at 650–51 n. 6, 594 A.2d 1115.

While the *Sugarloaf* case was pending, the county applied for, and MDE decided to issue, air quality construction and refuse disposal permits. The appellants then contesting the PSD permit demanded an adjudicatory hearing on those permits as well. Although initially of the view that adjudicatory hearings were not required with respect to any of the permits, when the *Sugarloaf* Opinion was filed in July, 1991, and a motion to reconsider was denied the following September, the Secretary of MDE, acting pursuant to Md.Code State Gov't. art., § 10–207, delegated to the Office of Administrative Hearings the authority to conduct an adjudicatory hearing and prepare a recommended decision on the proposed air quality construction and refuse disposal permits.[1]

---

1. The initial delegation, in September, 1991, was limited to the air quality construction permit. That delegation was later broadened to include the refuse permit as well.

The county, which had challenged the protestants' standing in the *Sugarloaf* case, also challenged their standing with respect to the construction and refuse disposal permits. Aware that standing would likely be an issue, the Secretary stated in his letter of delegation:

"This referral does not reflect a decision by me or MDE that the association or the individual property owners have standing to participate in the hearing. I anticipate that standing will be an issue at the hearing. It is my desire, therefore, that the administrative law judge entertain arguments on the issue of standing and make findings for me to consider."

A proper methodology for resolving the standing issues was established prior to the administrative hearing. The county continued to maintain that neither the three original protestants nor the additional organizations and individual landowners who sought to become parties had proper standing. To avoid the danger of a remand if the protestants were excluded from participation and a reviewing court were to conclude that they had standing, the county withdrew any objection to their participating at the administrative level, provided that findings as to their standing were made at the conclusion of the hearing. The hearing, which consumed 15 days, was conducted on that basis; appellants were permitted to testify and produce evidence on all issues, including those relating to their standing.

On June 17, 1992, Administrative Law Judge Suzanne S. Wagner filed a comprehensive 170–page proposed decision and order finding that (1) appellants had failed to establish standing under common law or statutory authority, and (2) the permits should issue. In accordance with the Secretary's request, the ALJ made specific findings regarding the standing of each of the appellants. Statutory standing under the Environmental Standing Act was rejected upon a finding that the appellants were not challenging a failure by MDE to perform a ministerial duty. See Md.Code Nat.Res. art., § 1–503(b).

With respect to common law standing on the part of the individual landowners, the ALJ found that they (1) owned property "in proximity to" the proposed RRF, (2) demonstrated that they use and enjoy, eat food grown on, and derive income from activities conducted on their respective properties, (3) were concerned about the possibility of adverse impact from the RRF"s emissions on the use, enjoyment, and value of their properties, but (4) "did not establish, with any degree of probability or specificity, the kind, quality, or extent of any harm they perceived."

Three of the organizational protestants (Sugarloaf Citizens Association, Dickerson–Beallsville Coalition, and Audubon Naturalist Society), she concluded, failed to demonstrate that they owned any property "proximate to the proposed RRF which might be harmed as the result of the construction of the proposed RRF." The fourth organizational protestant (Izaac Walton League) owned a 360–acre tract four miles from the site and, though concerned about the possibility of adverse impact from RRF emissions, "failed to establish, with any probability or specificity the kind, quality or extent of any harm they perceived as the result of construction of the proposed RRF."

In further discussion of the standing issues, the ALJ stated that, while the individual protestants expressed "genuine generalized concerns about possible adverse consequences to the Dickerson area as the result of emissions from the proposed RRF," none of them presented "any specific evidence related to his or her perceived harm from the facility." She continued: "Each feared an adverse impact on local produce, but no evidence was produced to substantiate what damage would occur, what the present level of pollutants is in local produce, or what the expected level would be as the result of emissions from the proposed RRF."

Addressing allegations of reduced property values, the ALJ found:

"All of the individual Plaintiffs expressed their concern that their property values might diminish as the result of

the proposed RRF. However, most of the Plaintiffs bought their properties in the past several years with full knowledge of the PEPCO facility, and some bought their properties after planning for the proposed RRF was already public knowledge. None of the individual Plaintiffs produced any specific evidence that his or her property values had decreased. They stated that properties were difficult to sell in the area, but also that property values in general have fallen significantly in the past few years as a result of the recession. *No one produced any evidence to demonstrate that the proposed RRF has or will decrease their property value, or to what extent.*

*The concerns expressed by the individual Plaintiffs are identical to the concerns of the public generally."*

(Emphasis added.) Similar findings were made with respect to the organizational protestants.

We are informed by appellants that extensive exceptions were filed to the ALJ's proposed decision and order, although none of them are in the record extract. Following a review of the record and consideration of argument, MDE, through the Secretary's Final Decision Maker, affirmed, for purposes of this appeal, the findings and conclusions of the ALJ. Specifically, MDE, in its Final Decision and Order, affirmed the ALJ's conclusion that none of the appellants had established common law standing.

As we indicated, appellants sought judicial review of the Final Decision and Order in the Circuit Court for Montgomery County. The court dismissed that action, however, upon a finding that none of the appellants had standing under either the common law or the Environmental Standing Act. This appeal followed.

## ENVIRONMENTAL STANDING ACT

■ The issue of appellants' standing under the Environmental Standing Act need not detain us long. Although that Act relaxed common law standing requirements in certain circumstances, the Court of Appeals made clear in *Medical*

*Waste v. Maryland Waste,* 327 Md. 596, 618, 612 A.2d 241 (1992), that the Act "does not broaden standing requirements in actions for direct judicial review of administrative proceedings." This is precisely that type of action; hence, no special statutory standing.

## COMMON LAW STANDING

■ To have standing under common law principles to challenge a final order or decision of an administrative agency entered in a contested case, a person must show two things—that he was a party to the administrative proceeding and that he is "aggrieved" by the agency's order or decision. *Medical Waste v. Maryland Waste, supra,* 327 Md. 596, 612 A.2d 241 (1992); *Bailey v. Dep't of Public Safety,* 333 Md. 397, 635 A.2d 432 (1994). There is no question here that appellants were parties to the administrative proceeding; with the county's acquiescence, they were permitted to participate in the proceeding, and they did participate by giving evidence and presenting argument. The only question is whether any of them were "aggrieved," in the legal sense.

■ The requirement of aggrievement is a well-established one that, in Maryland, arose principally in zoning cases. The nature of the requirement and the manner in which it is to be applied were discussed by the Court in some detail in *Bryniarski v. Montgomery County,* 247 Md. 137, 230 A.2d 289 (1967). The Court defined the requirement, at least in the context of appeals from zoning decisions, thusly:

"[A] person aggrieved by the decision of a board of zoning appeals is one whose personal or property rights are adversely affected by the decision of the board. The decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is personally and specially affected in a way different from that suffered by the public generally."

247 Md. at 144, 230 A.2d 289.

Absent some supervening law to the contrary, that test, though most often applied in zoning cases, is the test to be

applied in any action for direct judicial review of an administrative order or decision, including decisions challenged on environmental grounds. *Medical Waste v. Maryland Waste, supra,* 327 Md. 596, 612–13, 612 A.2d 241. The issue here is not in the statement of the test but in its application.

Here, too, *Bryniarski* is instructive. The Court there noted that the circumstances under which this special kind of aggrievement occurs have generally been determined on a case-by-case basis, the decision resting on the facts of the particular case, but that certain principles had evolved in judging the issue. It stated those principles, at least in the context of zoning appeals, as follows:

(1) It is sufficient if the facts constituting aggrievement appear in the petition for appeal either by express allegation or by necessary implication.

(2) An adjoining, confronting, or nearby property owner is deemed, *prima facie,* to be specially damaged and, therefore, a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for appeal and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved.

(3) A person whose property is far removed from the subject property ordinarily will not be considered a person aggrieved unless he meets the burden of alleging and proving by competent evidence—either before the board or in the court on appeal if his standing is challenged—the fact that his personal or property rights are specially and adversely affected by the board's action.

(4) If any appellant is a person aggrieved, the court will entertain the appeal even if other appellants are not persons aggrieved.

(5) The status of a person to appeal as a "person aggrieved" is to be distinguished from the result on the merits of the case itself. In determining status to appeal, the question is wheth-

er the property owner may reasonably be thought to be specially damaged if the application is approved.

*Bryniarski* is enlightening not only for the statement of these principles but also for their application. At issue there was an application for special exceptions to permit the construction of an apartment hotel on a 1.7–acre parcel and for off-street parking, as an adjunct to the hotel, on an adjoining 4.1 acre tract. Bryniarski's property abutted the property to be used for the parking lot; two other protestants lived directly across the street from the site. All three were given notice of the application pursuant to a county ordinance requiring such notice to persons likely to be aggrieved; all three presented evidence before the board as to the adverse impact of the proposal on their properties. Unlike the circuit court, which dismissed their appeal from the grant of the special exceptions for lack of standing, the Court of Appeals found that evidence sufficient to establish, at least *prima facie*, that Bryniarski and two other protestants were persons aggrieved.

The posture in which the case reaches the reviewing court is important. Where no evidence was taken at the administrative hearing with respect to any particular effect that the proposal under consideration might have on the protestant's property and no finding was made by the agency on that issue, the court may have nothing more before it with respect to standing than allegations of proximity and harm. In that circumstance, the court may need to take evidence (or, where possible, judicial notice) of proximity and, depending on its finding as to proximity, further evidence as to special harm. If the protestant's property adjoins or confronts the site of the proposal in dispute, special harm may be inferred, at least *prima facie;* if it does not, the protestant must offer some evidence to establish his special harm.

Where, on the other hand, the issue of standing has been litigated at the administrative level and findings based on substantial evidence have been made, the court need not relitigate that issue *de novo.* As *Bryniarski* itself makes

clear, the court may rely on the administrative record, if it is sufficient, to determine standing.

■ It is undisputed that none of the appellants owns property adjoining or confronting the site of the RRF. The nearest land of any of the àppellants is 2,000 feet from the site; the other individual appellants live between one and three-and-a-half miles away. That alone, however, is not determinative in this case. Because the issue of standing was litigated before the ALJ and findings were made with respect to the nature and extent of any harm likely to occur from the construction and operation of the RRF, we are no longer dealing with simple allegations. Thus, even if we were to consider the nearest, or any, of appellants to be in close proximity to the site, we must look to see if those appellants offered sufficient evidence to establish the kind of special impact required.

The ALJ and MDE, of course, concluded that, while generalized concerns were expressed, appellants failed to produce sufficient evidence to show the nature and extent of any actual, prospective harm. In challenging that conclusion, appellants point, essentially, to three pieces or categories of evidence. They note first that the RRF will emit certain levels of (1) volatile organic compounds and nitrogen oxides, substances that have been shown to increase ozone levels, (2) lead, (3) dioxins, furans, and dioxin-like chemicals, (4) mercury, and (5) polychlorinated biphenyl (PCB) and arsenic, all of which are toxic and potentially harmful. They refer as well to exhibits, in particular a 1989 study carried out for Montgomery County by Weston Consultants, showing that more of these emissions will likely fall on their properties than on properties much farther from the site. Finally, they rely on a preliminary screening analysis conducted by the Department of Natural Resources (DNR) concerning the effect of arsenic, mercury, dioxin, and PCB on fish taken from a hypothetical pond.

The agency did not ignore this evidence; indeed, it considered in detail the levels of these substances likely to be

emitted by the RRF and the effect of those emissions. It considered appellants' evidence in the light of a great deal of other evidence demonstrating that the probable emissions from the RRF would be insignificant or well within acceptable limits established by national health and environmental agencies.

The ALJ noted, for example, the Weston study's conclusion that the risk of cancer to a "maximum exposed person" from the RRF"s air emissions was less than one chance in a million, a level that the U.S. Environmental Protection Agency characterizes as insignificant. (Weston compared the risk to a 2.4 per million risk from drinking and showering with chlorinated water, a 250 per million risk from peanut butter consumption by children, and a 4,640 per million risk from pesticide residue on fresh foods.) Moreover, none of the appellants alleged that his or her exposure would in fact approach that of a "maximum exposed person."

The agency discounted the conclusion of the DNR preliminary screening analysis that a maximally exposed farm pond "may have unacceptable levels of the arsenic, mercury, dioxins, and PCB's" because the study was based on hypothetical assumptions that were shown to be unrealistic and because it was not intended to be a refined, final analysis. Its principal purpose was to determine those areas of possible concern that merited further study, and it, therefore, made a number of assumptions that would tend to overstate the harm from RRF emissions. Most important, the agency took into account the *lack* of evidence as to (1) the levels of the potentially hazardous substances currently on appellant's properties, (2) how much those levels would likely be increased by the RRF, and (3) the probable effect of such increases.

As we have indicated, where the issue of standing has been fully litigated by the agency, parties do not achieve the status of aggrieved persons *gratis,* or based on bare allegations, or solely on evidence they have produced. A court is entitled to credit the agency's findings if there is substantial evidence in the record as a whole to support them. Here, there was.

JUDGMENT AFFIRMED; APPELLANTS TO PAY THE COSTS.