686 A.2d 605

**SUGARLOAF CITIZENS' ASSOCIATION et al.**

v.

**DEPARTMENT OF ENVIRONMENT et al.**

**No. 60 Sept. Term 1995.**

Court of Appeals of Maryland.

Dec. 20, 1996.

272

274

Mick G. Harrison (Richard E. Condit, on brief), Washington, DC, for Petitioner.

Lawrence P. Fletcher–Hill, Assistant Attorney General (Joseph J. Curran, Jr., Attorney General; Ann Marie DeBiase, Assistant Attorney General, on brief), Baltimore, for Appellee.

Deborah E. Jennings (Roger D. Redden, Gina M. Zawitoski, Piper & Marbury, L.L.P., on brief), Baltimore, for Respondent.

Charles W. Thompson, Jr., County Attorney (A. Katherine Hart, Senior Assistant County Attorney, Diane Schwartz Jones, Associate County Attorney, on brief) Rockville, for Montgomery County.

Andrea C. Ferster, Laura D. Middleton, Washington, DC, Amicus Curiae for Montgomery Cty.

Argued before MURPHY, C.J.,* and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI and BELL, JJ.

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and the adoption of this opinion.

ELDRIDGE, Judge.

The dispute in this case concerns the decision of the Maryland Department of the Environment (the Department) to issue two permits which authorized the construction of a solid waste incinerator near Sugarloaf Mountain in Dickerson, Maryland. A group comprised of local landowners, environmental organizations and citizens' groups challenged the Department's decision by filing in the Circuit Court for Montgomery County an action for judicial review under the Maryland Administrative Procedure Act, Maryland Code (1984, 1995 Repl.Vol.), § 10–222 of the State Government Article.[1] The circuit court dismissed the action on the ground that none of the plaintiffs had standing to seek review of the Department's decision. The Court of Special Appeals affirmed. *Sugarloaf v. Dept. of Environment*, 103 Md.App. 269, 653 A.2d 506 (1995). We issued a writ of certiorari to determine whether the two courts below correctly interpreted and applied Maryland law regarding standing to maintain actions for judicial review of adjudicatory administrative decisions. Since we shall hold that both courts below erred with respect to standing, we shall also determine whether the administrative deci-

---

1. The plaintiffs in this action include the following organizations and landowners:

(1) the Audubon Naturalist Society, owner of property approximately 20–25 miles from the incinerator;

(2) the Izaak Walton League, owner of property approximately 4 miles from the incinerator;

(3) the Sugarloaf Citizens' Association, a non-profit organization seeking to protect and preserve the environment;

(4) the Dickerson–Beallsville Coalition, a non-profit organization with 9 of its 44 members owning property close to the incinerator;

(5) the Buchanans, owners of 234 acres of land located adjacent to the tract of land containing the incinerator, and approximately 2,000 feet from the incinerator itself;

(6) Kenneth Cox and Tracey Morgan, owners of 16 acres of land located approximately 1 mile from the incinerator;

(7) Jane Hunter, owner of 55 acres of land located approximately 1 mile from the incinerator;

(8) Gail Morgan, owner of 16 acres of land located approximately 1 mile from the incinerator; and

(9) John Snitzer, owner of 2 1/2 acres of land located approximately 1 1/4 miles from the incinerator.

sion should be upheld on the merits in light of the judicial review criteria set forth in the Administrative Procedure Act, § 10–222(h)(3) of the State Government Article.

## I.

The Potomac Electric Power Company (PEPCO) owned a tract of land, containing over 1,000 acres, in the Dickerson area of Montgomery County, Maryland. Two generating stations operated by PEPCO and auxiliary structures were on the tract. In 1987, PEPCO and Montgomery County entered into a transaction whereby the County purchased a 35–acre portion of the PEPCO tract to build a Resource Recovery Facility which would incinerate solid waste and would produce energy for sale to PEPCO. The facility was to be designed and constructed jointly by Montgomery County and the Northeast Maryland Waste Disposal Authority.

Among the several plaintiffs who opposed the construction of this facility were the Buchanans, owners of approximately 234 acres of land immediately adjacent to the PEPCO tract. About two hundred of the Buchanans' acres are devoted to farming, while the remaining acreage constitute woodland.[2] The Buchanans' property is located approximately 2,000 feet from the facility, and is separated from the PEPCO property by a narrow road.[3]

In 1988 Montgomery County and the Northeast Maryland Waste Disposal Authority filed an application with the Department for a Prevention of Significant Deterioration (PSD)

---

**2.** The Buchanans had resided on this property since 1988. Following Mr. Buchanan's recent death, Mrs. Buchanan continues to reside on this property with three of her seven children. The property is also used for boarding and training horses and riders. The Buchanans grow various crops on this property, which is a source of food for both the family and the horses.

**3.** According to testimony at the administrative hearing, the Buchanan property is located only 600 feet from the site of the proposed incinerator. Later at the hearing, however, counsel for the parties stipulated that the property was 2,000 feet from the facility.

permit, the first permit in the PSD permit process required by the federal Clean Air Act, 42 U.S.C. § 7401 *et seq.*, the Maryland Air Quality Control statutes, Code (1982, 1996 Repl. Vol.), Title 2 of the Environment Article, and implemented by the Air Management Administration of the Maryland Department of the Environment.[4]

The present case had its genesis in this Court's opinion in *Sugarloaf v. Waste Disposal*, 323 Md. 641, 594 A.2d 1115 (1991) (*Sugarloaf I*), where some of the present plaintiffs argued that they were entitled to a "contested case" administrative hearing on the application by the County and the Authority for the PSD approval permit.[5] In rejecting this argument, we held that, although a full contested case hearing was available upon an application for a construction permit, it was not available at the PSD approval stage.[6] The Court did not, however, determine whether any of the plaintiffs would have standing to seek judicial review of a Department decision

---

4. Hereinafter the County and the Authority will sometimes be referred to collectively as the "applicants."

5. A "contested case" is defined in Maryland's Administrative Procedure Act, Code (1984, 1995 Repl.Vol.), § 10–202(d) of the State Government Article, as follows:
 "*Contested case.*— (1) 'Contested case' means a proceeding before an agency to determine:
 (i) a right, duty, statutory entitlement, or privilege of a person that is required by statute or constitution to be determined only after an opportunity for an agency hearing; or
 (ii) the grant, denial, renewal, revocation, suspension, or amendment of a license that is required by statute or constitution to be determined only after an opportunity for an agency hearing."
 As discussed in *Sugarloaf I*, a "contested case" hearing is a hearing at which trial-type procedures are followed. *See* Code (1995 Repl.Vol.), §§ 10–201 through 10–217 of the State Government Article. *See also Sugarloaf I, supra*, 323 Md. at 651, 594 A.2d at 1120.

6. We held that, consistent with provisions of COMAR 26.11.02.11M and Code (1982, 1996 Repl.Vol.), § 2–404 of the Environmental Article, only a non-trial type hearing, at which the parties and the public are given an opportunity to comment, is required at the PSD approval stage. We categorized the PSD approval stage as being "merely a preliminary or interlocutory requirement." *See Sugarloaf I*, 323 Md. at 653–659, 594 A.2d at 1121–1124.

to issue a construction permit. *Sugarloaf I, supra,* 323 Md. at 650–651 n. 6, 594 A.2d at 1119 n. 6.

In light of this Court's decision in *Sugarloaf I,* the Secretary of the Department delegated authority to the Office of Administrative Hearings, under Code (1984, 1995 Repl.Vol.), § 10–207 of the State Government Article, to hold a contested case hearing on the issue of whether a permit to construct should be issued to the applicants. The Secretary later expanded this authority to include consideration of whether a refuse disposal permit should be issued.[7] The Secretary also requested that the Administrative Law Judge (ALJ) "enter-

---

7. In addition to the permits required under the federal Clean Air Act and the Maryland Air Quality Control statutes, § 9–204(d) of the Environment Article requires a person to obtain a refuse disposal permit before installing a refuse disposal system. For purposes of § 9–204(d), a "refuse disposal system" includes 1) an incinerator; 2) a transfer station; 3) a landfill station; 4) a landfill; 5) a solid waste processing facility; and 6) any other solid waste acceptance facility. *See* § 9–201(e) of the Environment Article. Section 9–210 of the Environment Article sets out the prerequisites for obtaining a refuse disposal permit as follows:

" § 9–210. Same—Prerequisites for issuance of permit.

(a) *In general.*—The Secretary may not issue a permit to install ... a refuse disposal system regulated under § 9–204(a) of this subtitle until the requirements set forth in this subsection are met in the following sequence:

(1) Except for the opportunity for a public informational meeting, the Department has completed its preliminary phase 1 technical review of the proposed refuse disposal system;

(2) The Department has reported the findings of its preliminary phase 1 technical review, in writing, to the county's chief elected official and planning commission of the county where the proposed refuse disposal system is to be located; and

(3) The county has completed its review of the proposed refuse disposal system, and has provided to the Department a written statement that the refuse disposal system:

(i) Meets all applicable county zoning and land use requirements; and

(ii) Is in conformity with the county solid waste plan."

Although the scope of the Department's delegation letter did not originally encompass the refuse disposal permit, the parties consented to having the two issues consolidated in one hearing after the plaintiffs initially raised issues relating to the refuse disposal permit.

tain arguments on the issue of standing and make findings." [8] Thereafter, Administrative Law Judge Suzanne S. Wagner conducted a 15–day hearing on these issues.

After the conclusion of the hearing, the ALJ submitted an opinion containing extensive findings and conclusions as well as a proposed order. The ALJ concluded: (1) the construction and refuse disposal permit applications conformed to applicable federal and state law, and the permits should be issued; (2) all of the plaintiffs lacked standing either under the Maryland Environmental Standing Act, Code (1974, 1989 Repl.Vol., 1995 Cum.Supp.), §§ 1–501 through 1–508 of the Natural Resources Article, or under Maryland common law principles of standing embodied in the Administrative Procedure Act, § 10–222(a) of the State Government Article, to bring an action challenging the Department's decision to issue the permits.[9] The Department adopted, without modification,

---

**8.** In his letter delegating the matter to an ALJ, the Secretary referred to "standing to participate in the [administrative] hearing." Nevertheless, in order to avoid a possible remand from the courts, the applicants made no objection to the plaintiffs' standing at the administrative level in this case, and the plaintiffs were in fact accorded standing.

**9.** The ALJ began the "standing" portion of her opinion as follows:

"Maryland law recognizes that individuals have standing to challenge administrative decisions when 1) they have been a party to the administrative proceedings, and 2) [they] are aggrieved by the agency decision. *Maryland–National Capital Park Planning Comm. v. Friendship Heights,* 57 Md.App. 69, 77, 468 A.2d 1353, *cert. denied,* 300 Md. 89, 475 A.2d 1200 (1984); *Bryniarski v. Montgomery County Board of Appeals,* 247 Md. 137, 143, 230 A.2d 289 (1967). In order to be aggrieved by an agency decision, an individual must have a specific interest or property right at stake that is different from those interests of the general public. *Bryniarski,* 247 Md. at 144, 230 A.2d 289."

After reviewing the plaintiffs' contentions regarding standing, the ALJ concluded:

"The concerns expressed by the individual Plaintiffs are identical to the concerns of the public generally. Everyone is concerned about the loss of rural areas to development. Everyone is concerned about the effects of emissions on the environment. The individual Plaintiffs expressed the concerns of all of us—is it necessary to have the RRF, and is it necessary to have it in my community. Their concerns were aired at various public hearings in this matter, and, after all of those hearings, it was determined by Montgomery County that municipal waste disposal is best addressed by source reduction, recycling,

the ALJ's findings, conclusions, and proposed decision, and issued the two permits.

The plaintiffs then brought the present action in the Circuit Court for Montgomery County, seeking judicial review of the final administrative decision. The circuit court, in a brief order, dismissed the action on the ground that all of the plaintiffs lacked standing to seek judicial review of the administrative decision.

The Court of Special Appeals, agreeing that the plaintiffs lacked standing, affirmed. *Sugarloaf v. Dept. of Environment, supra*, 103 Md.App. 269, 653 A.2d 506. In its opinion, the Court of Special Appeals indicated that the standing issue in the present case concerned the plaintiffs' standing to bring a judicial review action in the circuit court and not their standing to be parties at the administrative hearing. The intermediate appellate court thus stated (103 Md.App. at 277, 653 A.2d at 510):

> "To have standing under common law principles to challenge a final order or decision of an administrative agency entered in a contested case, a person must show two things—that he was a party to the administrative proceeding and that he is 'aggrieved' by the agency's order or decision. *Medical Waste v. Maryland Waste, supra*, 327 Md. 596, 612 A.2d 241 (1992); *Bailey v. Dep't. of Public Safety*, 333 Md. 397, 635 A.2d 432 (1994). There is no question here that appellants were parties to the administrative proceeding; with the county's acquiescence, they were permitted to participate in the proceeding, and they did participate by giving evidence and presenting argument.

---

incineration and landfilling, and further, it is necessary to build the RRF, and it should be located in Dickerson, Maryland. In my opinion, the individual Plaintiffs in this case have not made sufficient showing to demonstrate that they are aggrieved in a 'specific interest or property right ... that ... is personally and specifically affected in a way different from that suffered by the public generally.' *Bryniarski v. Montgomery County Bd. of Appeals*, 247 Md. 137, 144, 230 A.2d 289 (1967)."

The only question is whether any of them were 'aggrieved,' in the legal sense."

The Court of Special Appeals also pointed out that, in determining whether the plaintiffs were "aggrieved" by the final administrative decision and thus had standing to bring a judicial review action, a court may look to the evidence adduced at the administrative hearing as well as the pleadings and any evidence submitted to the circuit court. The Court of Special Appeals, however, went further and held that, in determining whether plaintiffs had standing to bring a judicial review action, the findings and conclusions of the ALJ regarding standing could be accepted if supported by substantial evidence. The intermediate appellate court stated (103 Md. App. at 279, 653 A.2d at 511):

> "Where ... the issue of standing has been litigated at the administrative level and findings based on substantial evidence have been made, the court need not relitigate that issue *de novo.*"

The Court of Special Appeals reviewed some of the evidence concerning the emission of "toxic and potentially harmful" substances from the facility, and a "study carried out for Montgomery County ... showing that more of these emissions will likely fall on [plaintiffs'] properties than on properties much farther from the site." 103 Md.App. at 280, 653 A.2d at 511. The appellate court next pointed to the ALJ's findings discounting certain evidence that the emissions " 'may have unacceptable levels of ... arsenic, mercury, dioxins, and PCB's,' " and the ALJ's findings that the emissions would be "insignificant or well within acceptable limits established by national health and environmental agencies." 103 Md.App. at 281, 653 A.2d at 512. The Court of Special Appeals then concluded (*ibid.*):

> "As we have indicated, where the issue of standing has been fully litigated by the agency, parties do not achieve the status of aggrieved persons *gratis,* or based on bare allega-

tions, or solely on evidence they have produced. A court is entitled to credit the agency's findings if there is substantial evidence in the record as a whole to support them. Here, there was."

The plaintiffs filed a petition for a writ of certiorari challenging the Court of Special Appeals' decision on the standing issue, and we granted the petition. During oral argument the respondents took the position that, if this Court were to conclude that the decisions below concerning standing were erroneous, then this Court could decide the merits.[10] The petitioners, in their rebuttal argument, stated that they were "ready" to have the case decided on the merits but that they would like to brief the merits first.[11] Subsequently, this Court issued an order directing the parties to file supplemental briefs as to whether the Department's decision "should be affirmed, reversed, modified, or the case remanded to the agency for further proceedings, in light of the judicial review

---

10. The following colloquy occurred between the Court and counsel for the applicants:

"THE COURT: Suppose we didn't agree with you on standing, but, after reviewing the record, believe there's substantial evidence to support the findings, can we affirm on that ground?
"APPLICANTS' COUNSEL: I believe you can. Absolutely.
* * *
"APPLICANTS' COUNSEL: I believe you can. Because in this case they chose to use the merits evidence as their evidence of standing. And, there's a very thorough 171–page proposed decision and order from the ALJ where she goes through all the evidence; she makes all the scientific judgments, and she finds no harm. But, frankly, Your Honor, in this case there was no evidence of harm."

11. During his rebuttal argument before this Court, counsel for the petitioners stated as follows:

"We're open and ready to decide this case on the merits. I would say just one last thing. If Your Honors are considering disposing this case on the merits, we think there would be a major due process problem with that. We have not briefed the merits in this case. There are several legal issues, violations, bases for permit denials, that are not addressed in our attempts to show aggrievement. So, we would at least ask for notice and a chance to brief those issues on the merits, if we're going to go to the merits, and we're ready to do that as soon as possible."

criteria set forth in the Administrative Procedure Act...."[12] Both sides have filed extensive supplemental briefs, with additional record extracts, on this issue.

## II.

## A.

The decisions below appear to reflect some confusion between standing to be a party at the administrative level and standing to maintain a judicial review action in the circuit court, as well as confusion over the appropriate roles of an administrative agency and a reviewing court with regard to each type of standing.

■ The cases in this Court, and the language of the Administrative Procedure Act itself, § 10–222(a)(1) of the State Government Article, recognize a distinction between standing to be a party to an administrative proceeding and standing to bring an action in court for judicial review of an administrative decision. Thus, a person may properly be a

---

12. The judicial review section of the Administrative Procedure Act, Code (1984, 1995 Repl.Vol.), § 10–222 of the State Government Article, provides in relevant part as follows:

" **§ 10–222. Judicial review.**

"(a) *Review of final decision.*—(1) Except as provided in subsection (b) of this section, a party who is aggrieved by the final decision in a contested case is entitled to judicial review of the decision as provided in this section.

\* \* \*

"(h) *Decision.*—In a proceeding under this section, the court may:

(1) remand the case for further proceedings;

(2) affirm the final decision; or

(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious."

party at an agency hearing under Maryland's "relatively lenient standards" for administrative standing but may not have standing in court to challenge an adverse agency decision. *Maryland–Nat'l v. Smith*, 333 Md. 3, 11, 633 A.2d 855, 859 (1993). *See Medical Waste v. Maryland Waste*, 327 Md. 596, 611–614, 612 A.2d 241, 248–250 (1992) (organization was a party at the administrative proceeding but lacked standing to maintain a judicial review action.)

The requirements for administrative standing under Maryland law are not very strict. Absent a statute or a reasonable regulation specifying criteria for administrative standing, one may become a party to an administrative proceeding rather easily. In holding that a particular individual was properly a party at an administrative hearing, Judge J. Dudley Digges for the Court in *Morris v. Howard Res. & Dev. Corp.*, 278 Md. 417, 423, 365 A.2d 34, 37 (1976), explained as follows:

"He was present at the hearing before the Board, testified as a witness and made statements or arguments as to why the amendments to the zoning regulations should not be approved. This is far greater participation than that previously determined sufficient to establish one as a party before an administrative agency. *See, e.g., Baxter v. Montgomery County*, 248 Md. 111, 113, 235 A.2d 536 (1967) (per curiam) (submitting name in writing as a protestant); *Bryniarski v. Montgomery Co.*, 247 Md. 137, 143, 230 A.2d 289, 293–94 (1967) (testifying before agency); *Hertelendy v. Montgomery Cty.*, 245 Md. 554, 567, 226 A.2d 672, 680 (1967) (submitting into evidence letter of protest); *DuBay v. Crane*, 240 Md. 180, 184, 213 A.2d 487, 489 (1965) (identifying self on agency record as a party to proceedings); *Brashears v. Lindenbaum*, 189 Md. 619, 628, 56 A.2d 844, 849 (1948) (same). Bearing in mind that the format for proceedings before administrative agencies is intentionally designed to be informal so as to encourage citizen participation, we think that absent a reasonable agency or other regulation providing for a more formal method of becoming a party, anyone clearly identifying himself to the agency for the record as having an interest in the outcome of the

matter being considered by that agency, thereby becomes a party to the proceedings."

More recently, Judge McAuliffe for the Court in *Maryland–Nat'l v. Smith, supra,* 333 Md. at 10, 633 A.2d at 859, summarized Maryland law relating to status as a party in administrative proceedings:

> "*Morris* and other cases of this Court indicate that the threshold for establishing oneself as a party before an administrative agency is indeed low. Although we have said that one's presence at the hearing and testimony in favor of an asserted position is sufficient, *id.,* we have also said that personal appearance and testimony at the hearing are not required. *Hertelendy v. Montgomery Cty.,* 245 Md. 554, 567, 226 A.2d 672 (1967); *Largo Civic Ass'n v. Pr. Geo's Co.,* 21 Md.App. 76, 81, 318 A.2d 834 (1974). In fact, it has been held to be sufficient that the hearing examiner considered the appellant to be a party, *Northampton Corp. v. Pr. George's Co.,* 21 Md.App. 625, 633–34, 321 A.2d 204, *rev'd on other grounds,* 273 Md. 93, 327 A.2d 774 (1974), or that the appellant's name was submitted to the Board of Appeals as one who would be aggrieved by an adverse decision. *Wright v. McCubbin,* 260 Md. 11, 14, 271 A.2d 365 (1970). *See also Baxter v. Montgomery County,* 248 Md. 111, 113, 235 A.2d 536 (1967) (submitting name in writing as a protestant is sufficient); *Bryniarski v. Montgomery Co.,* 247 Md. 137, 143, 230 A.2d 289 (1967) (testifying before agency is sufficient); *DuBay v. Crane,* 240 Md. 180, 184, 213 A.2d 487 (1965) (identifying self on agency record as a party is sufficient)."

*See Medical Waste v. Maryland Waste, supra,* 327 Md. at 611–612, 612 A.2d at 248–249.

For a person or entity to maintain an action under the Administrative Procedure Act for judicial review of an administrative decision, the person or entity "must both be a 'party' to the administrative proceedings and be 'aggrieved' by the final decision of the agency." *Medical Waste v. Maryland Waste, supra,* 327 Md. at 611, 612 A.2d at 248. *See* § 10–

222(a)(1) of the State Government Article; *Bailey v. Dep't. of Public Safety,* 333 Md. 397, 405, 635 A.2d 432, 436 (1994); *Maryland–Nat'l v. Smith, supra,* 333 Md. at 11, 633 A.2d at 859 ("Establishing the [plaintiff's] status as a party to the proceedings before the Board of Appeals completes only half of the required analysis; the [plaintiff] must also be aggrieved by the Board's decision in order to have standing").

■ While the term "aggrieved" is not defined in the Administrative Procedure Act, we have held that the statutory requirement that a party be " 'aggrieved' mirrors general common law standing principles applicable to judicial review of administrative decisions." *Medical Waste v. Maryland Waste, supra,* 327 Md. at 611 n. 9, 612 A.2d at 248–249 n. 9; *Bryniarski v. Montgomery Co.,* 247 Md. 137, 143–146, 230 A.2d 289, 294–295 (1967). Accordingly, in order to be "aggrieved" for purposes of judicial review, a person ordinarily must have an interest " 'such that he is personally and specifically affected in a way different from . . . the public generally.' " *Medical Waste v. Maryland Waste, supra,* 327 Md. at 611 n. 9, 612 A.2d at 248–249 n. 9, quoting *Bryniarski v. Montgomery Co., supra,* 247 Md. at 144, 230 A.2d at 294. *See Maryland–Nat'l v. Smith, supra,* 333 Md. at 11, 633 A.2d at 859; *Abramson v. Montgomery County,* 328 Md. 721, 733, 616 A.2d 894, 900 (1992); *DuBay v. Crane,* 240 Md. 180, 185, 213 A.2d 487, 489–490 (1965) ("the [administrative] decision must not only affect a matter in which the protestant has a specific interest or property right but his interest therein must be such that he is personally and specially affected in a way different from . . . the public generally").

■ In the present case, the letter from the Secretary of the Department delegating authority to an ALJ to hold a hearing requested that the ALJ render findings and conclusions on whether the plaintiffs had standing to participate in the administrative hearing. If there were a statutory provision or a regulation setting forth criteria for administrative standing, the Secretary's request would have been appropriate. Under such circumstances, the ALJ could properly make

findings and conclusions concerning administrative standing. No party in the instant case, however, has called to our attention any statute or regulation prescribing criteria for administrative standing in a case like this, and we are not aware of any such statute or regulation. Consequently, under the decisions of this Court discussed above, the plaintiffs were appropriately accorded standing as parties to the administrative hearing. There was no proper issue of administrative standing to be resolved by the ALJ.

The ALJ, however, did in fact render findings and conclusions with respect to the plaintiffs' standing, holding that the plaintiffs would not be "aggrieved" by the issuance of the permits and that, therefore, they did not "have standing to challenge the administrative decisions." The ALJ purported to apply the case law dealing with standing in court to maintain a judicial review action. If the ALJ's findings and conclusions concerning the plaintiffs' standing were intended to relate to administrative standing, the ALJ clearly applied an erroneous standard. Moreover, as pointed out previously, the plaintiffs were in fact properly accorded administrative standing. The plaintiffs' status at the administrative hearing was simply a non-issue.

If, on the other hand, the ALJ was rendering findings and conclusions on the plaintiffs' entitlement to maintain a judicial review action, which appears more likely and which was the Court of Special Appeals' interpretation of the ALJ's opinion, then the ALJ went beyond her proper role. In addition, the Court of Special Appeals erred in according any deference to the ALJ's findings and conclusions concerning judicial standing.

 Under basic principles of administrative law, as well as the separation of powers requirement set forth in Article 8 of the Maryland Declaration of Rights,[13] it is not the proper

---

13. Article 8 of the Declaration of Rights states as follows:

"**Article 8. Separation of powers.**

function of an administrative official or agency in the executive branch of government to decide whether a plaintiff or potential plaintiff has standing to maintain an action in court. The purpose of the "Contested Cases" subtitle of the Administrative Procedure Act is "to resolve disputes in administrative prceedings," Code (1984, 1995 Repl.Vol.), § 10–201(1) of the State Government Article, and *not* to resolve disputes in judicial proceedings.

The General Assembly may, of course, enact legislation affecting a person's standing to bring a type of action in court or prescribing criteria for standing to bring such an action. *See, e.g., State Administrative Bd. v. Election Bd. of Balt.,* 342 Md. 586, 596–597, 679 A.2d 96, 101 (1996); *Medical Waste v. Maryland Waste, supra,* 327 Md. at 614–623, 612 A.2d at 250–255; *Boulden v. Mayor,* 311 Md. 411, 414, 535 A.2d 477, 479 (1988); *Public Serv. Comm'n v. Md. People's Counsel,* 309 Md. 1, 6–10, 522 A.2d 369, 371–373 (1987); *Dep't. of State Planning v. Mayor and Council of Hagerstown,* 288 Md. 9, 10–16, 415 A.2d 296, 297–300 (1980). Nevertheless, with respect to the allocation of functions between administrative agencies and the judiciary, the determination of whether a person has standing to maintain an action in court is exclusively a judicial function. *See, generally, Attorney General v. Johnson,* 282 Md. 274, 283–290, 385 A.2d 57, 63–67, *appeal dismissed,* 439 U.S. 805, 99 S.Ct. 60, 58 L.Ed.2d 97 (1978); *Shell Oil Co. v. Supervisor,* 276 Md. 36, 44–47, 343 A.2d 521, 526–527 (1975); *Dep't of Nat. Res. v. Linchester Sand and Gravel Corp.,* 274 Md. 211, 220–223, 334 A.2d 514, 521–522 (1975); *Dal Maso v. County Commrs.,* 182 Md. 200, 205, 34 A.2d 464, 466 (1943); *Mayor and Council of Hagerstown v. Dechert,* 32 Md. 369, 383 (1870); *Wright v. Wright's Lessee,* 2 Md. 429, 452–453 (1852); *Miller v. State,* 8 Gill. 145, 148–150 (1849); *Berrett v. Oliver et al.,* 7 G. & J. 191, 206 (1835). *See also New England Rehabilitation Hosp. v. CHHC,* 226 Conn.

---

"That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

105, 627 A.2d 1257, 1272 (1993) (administrative agency is not "vested with the authority to decide ... who could challenge an adverse decision of the agency in court"); *Rose v. Freedom of Information Com'n,* 221 Conn. 217, 602 A.2d 1019, 1024 (1992); *Kemp–Golden v. Dept. of Children & Fam.,* 281 Ill. App.3d 869, 217 Ill.Dec. 599, 605–606, 667 N.E.2d 688, 694–695 (1996).

In holding that the issue of standing in court may properly be litigated at the administrative level, and that a reviewing court may appropriately defer to the agency's findings and conclusions regarding judicial standing if those findings and conclusions are supported by substantial evidence, the Court of Special Appeals relied on *Bryniarski v. Montgomery Co., supra,* 247 Md. 137, 230 A.2d 289. The *Bryniarski* opinion pointed out that, when "[a] person whose property is far removed from the subject property" faces a challenge in court to his standing, and therefore attempts to establish in court that he is aggrieved by an administrative zoning decision, he may rely on "evidence" before the agency, as well as evidence before the court, to show "that his personal or property rights are specially and adversely affected by the [administrative] action." 247 Md. at 145, 230 A.2d at 295. The opinion in *Bryniarski* did not suggest that it would be appropriate for the administrative agency to render findings and conclusions with regard to standing in court, or that a reviewing court should give any deference to administrative findings and conclusions when deciding whether the plaintiff was entitled to maintain an action for judicial review. Instead, *Bryniarski* clearly viewed the resolution of the standing dispute to be exclusively a judicial function. Thus, the Court in *Bryniarski* referred to the standing issue as having been "determined *by the courts* on a case by case basis," and, in commenting on a prior case, *Bryniarski* referred to findings of the *"trial court* ... on conflicting evidence, that the protestant was a person aggrieved." 247 Md. at 144–145, 230 A.2d at 294–295, emphasis added.

The other cases in this Court have also treated the question of standing to maintain a judicial review action as a matter to

be resolved exclusively by the courts. Thus, in *Town of Somerset v. Montgomery County Board of Appeals*, 245 Md. 52, 63, 225 A.2d 294, 301 (1966), Judge Oppenheimer for the Court stated:

"When the issue of the standing of an appellant to [seek judicial review] is raised in the court in which review of the administrative action is asked, we have approved the practice of trial judges in permitting testimony on the point to be taken before them, *see e.g.*, *Chatham Corp. v. Beltram,* 243 Md. 138, 148, 220 A.2d 589 (1966) and *Wilkinson v. Atkinson,* 242 Md. 231, 218 A.2d 503 (1966). The question is not one of taking additional testimony on the merits of the substantive issues decided by the Board [compare *Suburban Properties, Inc. v. Mayor and Council of Rockville*, 241 Md. 1, 5–6, 215 A.2d 200 (1965) and cases therein cited], but of determining whether the appellants have the requisite standing to have those issues reviewed."

*See, e.g., Maryland–Nat'l v. Smith, supra,* 333 Md. at 11–14, 633 A.2d at 859–861; *Morris v. Howard Res. & Dev. Corp., supra,* 278 Md. at 424–425, 365 A.2d at 38 (judicial standing issue should be adjudicated by the circuit court "through a motion or other pleading filed by [an adverse party] to dismiss Morris as a party, Morris's answer thereto, and testimony if need be on the point"); *Baxter v. Montgomery County,* 248 Md. 111, 113, 235 A.2d 536, 537 (1967) (it is the trial court's function to decide whether the plaintiffs are aggrieved, and "the court may hear evidence to establish that aggrievement"); *Kennerly v. Mayor & Council of Baltimore,* 247 Md. 601, 606, 233 A.2d 800, 803 (1967); *Hertelendy v. Montgomery Cty.,* 245 Md. 554, 564–568, 226 A.2d 672, 678–680 (1967); *The Chatham Corp. v. Beltram,* 243 Md. 138, 148–149, 220 A.2d 589, 595 (1966); *Wilkinson v. Atkinson,* 242 Md. 231, 233–235, 218 A.2d 503, 505–506 (1966); *Brashears v. Lindenbaum,* 189 Md. 619, 628–629, 56 A.2d 844, 849 (1948) ("These jurisdictional facts [showing standing to seek judicial review and thereafter to appeal] should appear from the record, and in the event of dispute, should be resolved by the Circuit Court").

The Court of Special Appeals, therefore, erred in holding that any deference could be given to the administrative decision concerning the plaintiffs' standing to maintain an action for judicial review.

### B.

The Court of Special Appeals also erred by blurring the distinction between standing to seek judicial review of an administrative decision and the merits of that administrative decision. While recognizing that there was evidence showing that more toxic substances from the incinerator would likely fall on the plaintiffs' properties than on properties much farther from the incinerator, the Court of Special Appeals relied on administrative findings "that the probable emissions from the [incinerator] would be insignificant or well within acceptable limits established by national health and environmental agencies." *Sugarloaf v. Dept. of Environment, supra,* 103 Md.App. at 281, 653 A.2d at 511–512. The Court of Special Appeals pointed out that the ALJ discounted conclusions from the Department of Natural Resources that "unacceptable levels of . . . arsenic, mercury, dioxins, and PCBs" may fall on nearby farm ponds. 103 Md.App. at 281, 653 A.2d at 512. Because, in the Court of Special Appeals' view, substantial evidence supported the ALJ's findings that the plaintiffs would not suffer "actual . . . harm" and that emissions falling on their properties would be insignificant or "within acceptable limits," 103 Md.App. at 280–281, 653 A.2d at 511–512, the intermediate appellate court concluded that the ALJ's views regarding the plaintiffs' lack of standing should be upheld.

Presumably, if the ALJ had found that the emissions from the incinerator would have been harmful to nearby property owners, or if the level of emissions were found to have been "unacceptable," the permits would not have been issued. Thus, under the analysis by the Court of Special Appeals, the issue of whether any of the plaintiffs were sufficiently affected to have standing, and the issue of whether the permits should have been granted, became identical.

Moreover, the applicants and the Department take the same approach before this Court, arguing that, since the level of emissions upon any of the plaintiffs' properties were found to have been "acceptable" under government air quality standards, none of the plaintiffs was sufficiently "harmed" to have standing to challenge in court the issuance of the permits. During oral argument before this Court, counsel for the applicants and the Department frankly acknowledged that, in their view, the standing issue and the merits were the same.[14]

In cases involving challenges to administrative land use decisions, there is a distinction between standing in court to obtain review of the governmental action and the merits of the challenger's position. Thus, in *Bryniarski v. Montgomery Co., supra*, 247 Md. at 145–146, 230 A.2d at 295, involving the administrative grant of a special exception permitting the construction and operation of an apartment hotel, this Court stated:

> "The status of a person to [obtain judicial review] as a 'person aggrieved' is to be distinguished from the result on the merits of the case itself.... If, on the merits, the board acted properly in approving the application, the protesting property owner is not damaged *in law*, however much he may be damaged *in fact*. His damage is then *damnum absque injuria*. Because the result on the merits might be adverse, however, does not mean that the protes-

---

**14.** Thus, when counsel for the applicants was asked by the Court whether there was a distinction between the effect upon the plaintiffs for purposes of standing and the amount of harm to air quality that would require denial of the permits, counsel replied:

> "Frankly your Honor, I think that where you have a full hearing as we had here, almost a month long, I think that distinction blurs."

The following colloquy occurred between the Court and the attorney for the Department:

> "ATTORNEY: In the context of this case, the merits are very close to the standing issue. That is, the question of whether one of the petitioners will be harmed is the same inquiry as is involved with standing.
> "THE COURT: You say it's very close, what is the difference?
> "ATTORNEY: Your honor, in this case, on that challenge to this permit, it may be indistinguishable."

tant would not have status to challenge the board's action." (Emphasis in original).

The Court in *Bryniarski* went on to hold that evidence indicating that there would be an increase in traffic in the area because of the apartment hotel was sufficient to give landowners, who were "contiguous or close in proximity" to the proposed hotel, standing to challenge in court the grant of a special exception. Such persons would have standing even if it were ultimately determined that the increase in traffic was not so great as to require denial of the special exception.

■ Similarly, with respect to a facility discharging toxins into the air pursuant to a permit, a nearby property owner may be subject to greater emissions than the public generally but, nevertheless, the amount falling upon the nearby property owner might be within "acceptable" limits. The impact upon a nearby property owner may well be different from the impact upon the general public but may not amount to legally cognizable harm. Therefore, standing to challenge governmental action, and the merits of the challenge, are separate and distinct issues. *See, e.g., Assn. of Data Processing Service Org. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184, 188 (1970) (whether there has been an invasion of one's " 'legal interest' . . . goes to the merits. The question of standing is different. It concerns . . . the question whether the interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute or constitutional guarantee in question "); *Flast v. Cohen,* 392 U.S. 83, 99, 88 S.Ct. 1942, 1952, 20 L.Ed.2d 947, 961 (1968) ("The fundamental aspect of standing is that it focuses on the party seeking to get his complaint before a . . . court and not on the issues he wishes to have adjudicated"); *Town of Somerset v. Board, supra,* 245 Md. at 63, 225 A.2d at 301 (distinguishing between "the merits of the substantive issues decided by the Board" and whether "the appellants have the requisite standing to have those issues reviewed"); Stein, Mitchell & Mezines, *Administrative Law* § 50.01, at 50–3 (5th ed. 1996) ("Questions of standing focus

not on the merits of the case but on what parties have the right to seek judicial review").

If a plaintiff's standing in court to challenge the issuance of a government permit allowing particular activity on the permittee's land were dependent upon the plaintiff's establishing that he or she would suffer legally cognizable harm, the result would be that numerous permits, issued after adjudicatory hearings, would be immune from judicial review. Furthermore, as illustrated by the present case, plaintiffs in judicial review actions would be faced with an unreasonable hurdle. The Court of Special Appeals did seem to require in the present case, as a pre-requisite for the denial of standing, that the record contain substantial evidence supporting the administrative findings and conclusions that the emission levels from the incinerator would be within acceptable limits under governmental standards. But, in the instant case, the plaintiffs' argument on the merits is not that particular findings by the ALJ were unsupported by substantial evidence. Instead, as discussed in Part III of this opinion, *infra*, the plaintiffs contend that the ALJ committed numerous errors of law by excluding relevant issues and evidence, by misconstruing the applicable governmental air quality standards, and by ignoring certain evidence. According to the plaintiffs' theory, if the ALJ had not erroneously excluded certain issues and evidence, the ALJ would have found that the levels of toxic substances falling on nearby property owners were not acceptable, and thus the nearby property owners would have suffered legally cognizable harm. Similarly, under the plaintiffs' theory, if the ALJ had applied correct governmental standards, she would have found that the amount of pollutants emitted from the incinerator and falling on nearby property owners was unacceptable. If the plaintiffs' contentions on the merits are valid, they may have suffered legally cognizable harm. But they were precluded from making these arguments in the courts below on the ground that, under the ALJ's decision, they would not suffer legally cognizable harm. Under the approach taken by the Court of Special Appeals and the respondents, an administrative agency can, by erroneously

excluding issues and evidence or by misconstruing the law, conclude that none of the challengers to the issuance of a permit would be harmed in a legally significant manner, and such finding, if supported by sufficient evidence at the hearing, would deprive any challengers of standing to maintain a judicial review action. The challengers would lack standing even though, if the challengers' arguments on the merits are sound, they might suffer such legally cognizable harm.

Consequently, we reject the argument that the plaintiffs lack standing because, in the respondents' view, the likely fallout of toxic substances upon their properties will be acceptable under government air quality standards. Under Maryland law, this is an erroneous test for standing.

## C.

It is a settled principle of Maryland law that, " 'where there exists a party having standing to bring an action . . . we shall not ordinarily inquire as to whether another party on the same side also has standing.' " *People's Counsel v. Crown Development Corp.*, 328 Md. 303, 317, 614 A.2d 553, 559–560 (1992), quoting *Board v. Haberlin*, 320 Md. 399, 404, 578 A.2d 215, 217 (1990). *See, e.g., County Council v. Md. Reclamation*, 328 Md. 229, 232 n. 1, 614 A.2d 78, 80 n. 1 (1992); *Sugarloaf v. Waste Disposal, supra*, 323 Md. at 650 n. 6, 594 A.2d at 1119 n. 6, and cases there cited.

The record in the present case establishes that the Buchanans had standing to maintain this action. Consequently, it is unnecessary to determine whether any of the other plaintiffs also had standing.

In actions for judicial review of administrative land use decisions, "[a]n adjoining, confronting or nearby property owner is deemed, *prima facie*, . . . a person aggrieved. The person challenging the fact of aggrievement has the burden of denying such damage in his answer to the petition for [judicial review] and of coming forward with evidence to establish that the petitioner is not, in fact, aggrieved." *Bryniarski v. Montgomery Co., supra*, 247 Md. at 145, 230 A.2d at 294. *See, e.g., Md.–Nat'l Cap. P. & P. v. Rockville*, 269 Md. 240, 248, 305

A.2d 122, 127 (1973) (indicating that one who "owns any property located within sight or sound of the subject property" is aggrieved); *Wier v. Witney Land Co.*, 257 Md. 600, 612–613, 263 A.2d 833, 839 (1970) (" 'At least three of the protestants ... are in sight distance of the property forming the subject of the petition. . . . These protestants were ... nearby property owners and are deemed, prima facie, to be specially damaged and, consequently, persons aggrieved' "); *Chatham Corp. v. Beltram*, 252 Md. 578, 251 A.2d 1, 4 (1969) ("In light of the testimony of Mr. Beltram and Mrs. Hahn with reference to the proximity of their homes within the same subdivision to the reclassified area ... there was no error in the ruling that [they] had standing to sue"); *Aubinoe v. Lewis*, 250 Md. 645, 650–652, 244 A.2d 879, 882–883 (1968); *The Chatham Corp. v. Beltram, supra,* 243 Md. at 148, 220 A.2d at 595 ("Since Beltram's evidence was that he owned property, in which he lived, in close proximity to the reclassified land ..., there was no error in ruling that Beltram had standing to sue"); *Toomey v. Gomeringer,* 235 Md. 456, 460, 201 A.2d 842, 844 (1964) (although "the protestants' properties were more than two city blocks away from the property for which rezoning was sought," they were accorded standing); *Bd. of Zoning Appeals v. Bailey,* 216 Md. 536, 539, 141 A.2d 502, 503 (1958) (standing accorded to zoning reclassification protestants who lived "three-fourths of a mile by road and between one-third and one-half a mile as the crow flies" from the subject property).

In cases involving government-issued permits allowing activity which causes the emission of toxic substances into the air, the concept of "nearby" property owners who are presumptively aggrieved may well include persons in a greater geographical range than in a typical zoning matter. We need not, however, explore that issue in the present case. Under the above-cited decisions, the Buchanans were adjacent or nearby property owners who were prima facie aggrieved. Their farm was adjacent to the PEPCO tract of land which encircled the incinerator and which contained the generating stations utilizing the energy produced by the incinerator. The

Buchanans' farm was only 2,000 feet from the incinerator itself. If the Buchanans' farm would not be considered adjoining or sufficiently nearby because of the size of the tract on which the joint PEPCO–Montgomery County operation was to take place, then no property owner would be presumptively aggrieved. In our view, the Buchanans were adjoining or nearby property owners, and, therefore, they were prima facie aggrieved. Since the respondents failed in the circuit court to "com[e] forward with evidence to establish that [they were] not, in fact, aggrieved," *Bryniarski v. Montgomery Co.*, *supra*, 247 Md. at 145, 230 A.2d at 294, the Buchanans had standing to maintain this action for judicial review.[15]

█ Moreover, as indicated earlier, the evidence adduced at the administrative hearing demonstrated that much higher

---

**15.** In arguing that the Buchanans were not "nearby" property owners and thus not presumptively aggrieved, the applicants rely upon *Wilkinson v. Atkinson*, 242 Md. 231, 218 A.2d 503 (1966), and *DuBay v. Crane*, 240 Md. 180, 213 A.2d 487 (1965) (Brief of Northeast Maryland Waste Disposal Authority and Montgomery County at 16). Neither case supports the applicants' argument. Both *DuBay* and *Wilkinson* involved challenges to zoning reclassifications. In *DuBay* the protestants lived "at least 1500 feet in a straight line from the rezoned property" (240 Md. at 183, 213 A.2d at 489), and in *Wilkinson* the protestants "could see the reclassified property from [their] home" (242 Md. at 234, 218 A.2d at 505). In both cases, upon evidence adduced in the circuit court, it was decided that the protestants were not aggrieved. The basis for both decisions, however, was not that the protestants were not "nearby" property owners. Instead, in each case the Court relied on the fact that the protestants' property was separated from the rezoned property by the Baltimore Beltway. The Court in *Wilkinson* thus stated (242 Md. at 235, 218 A.2d at 506):

> "The [protestants'] property is on the opposite side of the Beltway, and, in *DuBay*, we pointed out ..., the Beltway 'if not a complete shield against the apartments to be constructed, will serve as an adequate barrier.' It is true that, in that case, the property was 1500 feet from the rezoned property, and it was not shown that Dubay could see the reclassified property from his home, *but it was the existence of the broad, heavily traveled intervening Beltway which was the determining factor.*" (Emphasis added).

In the case at bar, unlike *DuBay* and *Wilkinson*, no evidence was presented to the circuit court rebutting the Buchanans' prima facie standing. Moreover, the evidence in the administrative record discloses no barrier to the emissions from the incinerator which would function comparably to the Baltimore Beltway in a zoning case.

levels of toxic substances would fall on the Buchanans' farm and on other nearby property owners than would fall on properties farther away from the site. This would ordinarily be expected in any case involving a permit for activity causing toxic emissions into the air. Thus, as acknowledged in the applicants' brief in this Court, there was expert testimony that property four miles from the incinerator would be less impacted than nearby property "that will be most impacted by the" incinerator. (Brief of the Northeast Maryland Waste Disposal Authority and Montgomery County at 27). The applicants also acknowledged "that the ambient impact analysis by [applicants'] expert shows different geographic areas experience different levels of impact" (*id.* at 21), and that persons in close proximity to the incinerator, such as the Buchanans, will be exposed to higher levels of pollutants.

As to the level of toxins on soil, vegetation and water, one expert stated that "the peak concentration point is predicted to occur" within four or five kilometers from the incinerator, while another expert put this distance as within three miles. The applicants' expert witness Dr. Jones had conducted a toxic risk assessment on the Buchanans' farm pond, and testified that one "would anticipate the highest deposition and runoff [of mercury and dioxide] into the [Buchanans'] pond." With respect to mercury contamination of fish taken from the pond, Dr. Jones stated that the "hazard index ... based on the emissions rates from ... this facility was approximately ... 20% of the allowable hazard index," and Dr. Jones characterized this as "acceptable" under federal air quality standards. With regard to dioxins, he stated that "the calculated risk for dioxins due to fish consumption of the pond was two and a half chances in a million" which he viewed as an "acceptable" risk.

As previously discussed, however, the fact that the level of pollutants from the incinerator falling on nearby property may be "acceptable" under governmental air quality standards, thereby justifying the issuance of the permits, is not the test for a plaintiff's standing to seek judicial review. Instead, the test is whether the plaintiff is affected in a way different from

the public generally. The administrative record in this case, without contradiction, shows that nearby property owners such as the Buchanans would be affected in a way different from the general public.

### III.

Turning to the merits, the plaintiffs contend that the ALJ committed numerous errors of law in the course of the extensive administrative hearing and in her proposed decision which was adopted by the Department.

### A.

The plaintiffs initially contend that the ALJ, in a prehearing memorandum order filed on December 24, 1991, concerning the issues to be considered at the adjudicatory hearing, erroneously excluded from consideration any "air quality issues addressed in the PSD approval stage" even though these same "air quality matters ... [were] at the heart of whether an air quality Permit to Construct should be issued." (Plaintiffs' supplemental brief at 17). The plaintiffs advance the same argument with regard to the refuse disposal permit. (*Id.* at 40–45). The only such allegedly excluded issue which is identified and discussed in the plaintiffs' briefs, however, concerned "the best available control technology for toxic air emissions" or "T–BACT" as it is referred to by the parties. The plaintiffs assert that "ALJ Wagner clearly erred in concluding that T–BACT ... issues were part of the PSD regulatory program and therefore must be excluded" from the adjudicatory hearing on the permit to construct and the refuse disposal permit. (*Id.* at 45).[16] The applicants respond by arguing, *inter alia,* that under the broad listing of issues which the ALJ agreed to consider, and at the hearing itself,

---

**16.** It is not clear to us, from the portions of the record contained in the record extracts before this Court, that the ALJ treated the T–BACT issues as being included in the "PSD" issues resolved at the earlier PSD permit stage. At times, the ALJ referred to "T–BACT" issues and "PSD" issues separately.

the plaintiffs "had the opportunity to present evidence . . . in relation to every applicable air regulatory standard." (Applicants' supplemental brief at 14).

If the ALJ had actually excluded issues and evidence relevant to the construction and the refuse disposal permit applications on the ground that such issues had been resolved in the earlier PSD permit proceeding, then we would agree with the plaintiffs that the ALJ would have committed a prejudicial error requiring a reversal of the administrative decision. As discussed previously, this Court in *Sugarloaf I* held that, under the statutory and regulatory air quality scheme, the permit to construct stage is the more appropriate time at which to hold a contested case hearing. *Sugarloaf I, supra,* 323 Md. at 659, 594 A.2d at 1124. In support of this conclusion, we explained as follows (323 Md. at 658, 594 A.2d at 1123):

> "The PSD approval, however, is simply a preliminary finding that the incinerator will not significantly harm the air quality in the Sugarloaf Mountain area generally. Although such approval is required in order to construct and operate the incinerator, the PSD approval itself does not authorize the construction or operation of the facility. As noted previously, Montgomery County and the Northeast Authority must engage in a permit application approval process at each of these stages also. Approval of the PSD permit has no immediate effect on any individual property rights, nor does it grant to the County the authority to begin constructing the proposed facility.
>
> "Conversely, the granting of a permit to construct would more immediately affect the individuals living around the proposed facility whose property might be harmed by the incinerator. The construction permit would create an immediate right in the County to begin building the facility. Clearly at this stage in the process, where actual harm may occur, a contested case hearing is more appropriate."

Because the PSD permit approval was "simply a preliminary finding," and because the PSD hearing was not a trial type

hearing, we specifically held in *Sugarloaf I* that "the determinations made at the non-trial type hearing at the PSD stage would not be preclusive under principles of res judicata or collateral estoppel." 323 Md. at 658–659 n. 13, 594 A.2d at 1123–1124 n. 13. Consequently, the resolution of an issue at the PSD stage would not preclude consideration of that same issue at a later administrative hearing on the construction permit or refuse disposal permit applications if the issue was pertinent to those permit applications.

The plaintiffs correctly assert that, in her memorandum order of December 24, 1991, the ALJ did state that "none of the PSD Approval determinations is subject to review in this proceeding." In a later pre-hearing proceeding, on February 10, 1992, the ALJ reiterated that "the issues involving ... PSD ... are all stricken from consideration at [the] hearing" and that "I will not entertain any evidence on those." These statements by the ALJ were inconsistent with *Sugarloaf I* and were erroneous to the extent that any PSD approval determinations concerned issues which were also pertinent to the applications for a construction permit or a refuse disposal permit. The ALJ did not in her December 24th memorandum order, or in any later statements, otherwise identify these PSD "determinations," and nothing in the parties' briefs or record extracts has enabled us to identify them. No portion of the transcript of the 15–day hearing, involving the exclusion of offered evidence, has been called to our attention.

As indicated earlier, the only issue which is identified and discussed in the plaintiffs' briefs as having been allegedly excluded because it was resolved at the PSD stage related to TBACT. Neither side disputes that consideration of T–BACT is relevant at both the PSD approval stage and the permit to construct stage.[17] Indeed, pursuant to COMAR 26.11.15.05,

---

17. "T–BACT" is defined in COMAR 26.11.15.01.B(3) as

"production technology, emissions control technology, operation and maintenance procedures, other measures, or combination of them that results in the maximum degree of emission reduction that the Department determines, on a case-by-case basis, is achievable by an

"[a] person may not construct, reconstruct, operate, or cause to be constructed, reconstructed, or operated any new installation or new source that will discharge a toxic air pollutant to the atmosphere without installing and operating T–BACT."

An examination of the record reveals, however, that the ALJ did not exclude T–BACT issues. To the contrary, in her findings, conclusions and proposed decision, the ALJ specifically listed the following as having been issues at the hearing: 2.e. "Will [the facility] comply with COMAR 26.11.15.06. regarding unreasonable endangerment?" and 2.f. "Will the pollution control equipment required for the [facility] adequately capture the volatized mercury, dioxin and related chemicals in order to avoid unreasonable endangerment?" These issues are directly relevant to a determination of whether the facility will be using T–BACT, as defined in COMAR 26.11.15.01.B(3). Moreover, the record reveals that the plaintiffs presented evidence concerning the T–BACT standard for mercury. For example, the plaintiffs introduced evidence regarding experimental work being performed in Germany and California on the use of carbon injection to control mercury. The ALJ recognized this evidence, but found that "[such technology] is not yet required for compliance with COMAR 26.11.15.05 [related to T–BACT]." Consequently, the ALJ concluded that, "although [the plaintiffs] raised a number of issues regarding the proposed [facility's] compliance with [COMAR 26.11.15], they presented no evidence to demonstrate the facility will not be using T–BACT." Accordingly, the record does not support the contention that the ALJ excluded the issue of T–BACT from consideration at the adjudicatory hearing.

Although the ALJ may have made erroneous statements in her pre-hearing memorandum and order of December 24, 1991, and at the pre-hearing proceeding on February 10, 1992,

---

installation, for each toxic air pollutant discharged, taking into account the potency and toxicity of each toxic air pollutant discharged as well as technical and economic feasibility."

the plaintiffs have failed to demonstrate that they were actually precluded at the adjudicatory hearing from raising an issue or presenting evidence pertinent to the construction and refuse disposal permits on the ground that the issues had earlier been resolved at the preliminary PSD stage.

## B.

The plaintiffs maintain that the ALJ "misconstrued the legal significance of uncontroverted evidence in the record of pollution from the ... incinerator that will cause harm to wildlife and humans." (Plaintiffs' supplemental brief at 30). Specifically, the plaintiffs argue that the ALJ ignored Department of Natural Resources (DNR) findings and expert opinions that emissions of toxic PCBs, arsenic and mercury will cause unsafe conditions in farm ponds and to fish within those ponds. For support, the plaintiffs rely primarily on a DNR Risk Assessment [18] indicating that toxic emissions of these pollutants will exceed the federal Environmental Protection Agency (EPA) criteria for pond water. The plaintiffs claim that, taken together, the presence of these pollutants in the environment would constitute both air pollution and a nuisance.[19] (*Id.* at 33).

Contrary to the plaintiffs' contention, the ALJ did not "ignore" this evidence. Rather, the ALJ was persuaded that arsenic emissions would be captured in a pollution control device which would keep the level of arsenic at acceptable levels. Moreover, the ALJ acknowledged that the risk assessment produced by the applicants did not calculate the risk for PCBs, but the ALJ accepted the opinion of the applicants' expert that "the risk from dioxin was most representative of

---

**18.** A "risk assessment" is a study of the increased risk of cancer caused by emissions resulting from the resource recovery facility.

**19.** For support, the plaintiffs cite COMAR 26.11.06.08 which provides in pertinent part: "An installation or premises may not be operated ... in such manner that a nuisance or air pollution is created."

the most significant risk." Accordingly, she determined that a risk analysis for PCBs was unnecessary.

The ALJ did, however, discuss at length the impact of mercury in farm ponds and upon fish within those ponds. Studies performed by the applicants' experts persuaded her that the level of mercury in fish and pond water would be substantially *below* EPA and federal Food and Drug Administration standards. In addition, the testimony of a Department environmental specialist convinced the ALJ that the mercury level in fish and other aquatic species would not increase if the facility was built. Consequently, the ALJ adopted the position that "risks to human health and aquatic organisms through mercury deposition in ponds are minimal and acceptable." Furthermore, the ALJ discussed evidence presented in the form of carcinogenic risk assessments by both the plaintiffs and the applicants, and she concluded that, under EPA standards, the overall level of risk to the environment from the facility was "insignificant." [20]

The ALJ did not "ignore" evidence that pollution from the incinerator will harm wildlife and humans. Instead, she considered such evidence, along with conflicting evidence, and made findings and conclusions. It is not the function of a reviewing court independently to weigh the conflicting evidence. *See MVA v. Karwacki*, 340 Md. 271, 280–285, 666 A.2d 511, 515–518 (1995), and cases there cited.

### C.

 The plaintiffs assert that the ALJ improperly determined that the level of dioxide emissions from the facility would comply with New Source Performance Standards (NSPS) under COMAR 26.11.06.12, as provided for in 40

---

**20.** "Insignificant risk concentration" is defined in COMAR 26.11.15.01B(8) as "a concentration of a ... toxic air pollutant in the atmosphere that would result in an excess individual lifetime cancer risk of not more than 1 in 100,000 ... assuming continuous exposure for 70 years and using procedures consistent with EPA's Risk Assessment Guidelines."

C.F.R. 60 (1992).[21] (Plaintiffs' supplemental brief at 37). Under 40 C.F.R. 60.53a(b), the standard for dioxide emissions is set at "30 nanograms per dry standard cubic meter." According to the plaintiffs, the ALJ erred in finding this standard to be equivalent to a .46 toxicity equivalent (TEQ) and, as a result, concluding that the .42 TEQ offered by the applicants met the standard under 40 C.F.R. 60.53a(b). The plaintiffs maintain that the ALJ, in using the two figures as equivalents, "arbitrarily redefined the law to the benefit of the Applicants." (Plaintiffs' supplemental brief at 37–39).

The record indicates that the ALJ did not "arbitrarily" arrive at .46 TEQ as an equivalent measure of compliance with NSPS. Rather, the ALJ cited the preamble to the Federal Register, in which the EPA explained that there are several methods by which the 30 nanograms can be measured, one of which is by toxicity equivalents (TEQs). *See* 56 Fed.Reg. 5504. Applying a method of calculation developed in 1987, the EPA explained that the 30 nanograms corresponded to a TEQ of approximately .46. Because the applicants calculated the level of dioxide emissions as .42 TEQ using the 1987 scheme, the ALJ appropriately applied the corresponding 1987 .46 TEQ limit to determine whether the dioxide level calculated by the applicants complied with NSPS. Accordingly, the ALJ did not commit an error of law by using .42 TEQ to determine whether the dioxide level conformed with NSPS.

### D.

The plaintiffs argue that the ALJ issued the permits without first considering whether the applicants had satisfied

---

**21.** The New Source Performance Standards apply to an "[i]ncinerator capable of charging more than 50 tons ... of refuse per 24–hour day." COMAR 26.11.01.01C(3). Under COMAR 26.11.06.12, "[a] person may not construct, modify, operate, or cause to be constructed, modified, or operated, a New Source Performance Standard (NSPS) source as defined in COMAR 26.11.01.01C, which results or will result in violation of the provisions of 40 CFR 60, 1992 edition." As noted in the plaintiffs' brief, if the facility is not in compliance with these standards, the MDE must deny an application for an air quality permit. *See* COMAR 26.11.02.06B(1)(a).

relevant provisions of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 *et. seq.* (1994), relating to solid waste incinerator ash. In particular, the plaintiffs argue that the federal statute requires 1) the testing of the incinerator ash and, if the test discloses that the ash is hazardous, 2) the designation of an appropriate landfill in which to store the hazardous ash.[22]

In 1994, the United States Supreme Court held that ash generated from a resource recovery facility was subject to the hazardous waste provisions contained in the Resource Conservation and Recovery Act. *City of Chicago v. Environmental Defense Fund,* 511 U.S. 328, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994).[23] Therefore, the ALJ erred in finding the federal statute inapplicable to the incinerator ash generated from the facility in question. Nevertheless, the ALJ was also persuaded by the applicants' argument that, "if it is determined the ash must be tested for toxicity and does, in fact, test toxic, [the Applicants] will dispose of such ash at the GSX Services Landfill." Thus, as an alternate ground for decision concerning this issue, the applicants satisfied the ALJ that they had considered the possibility that the ash might test hazardous and would deal with the situation accordingly.

### E.

On a related issue, the plaintiffs contend that the refuse disposal permit was incomplete because it lacked necessary disposal sites for the non-hazardous and possibly hazard-

---

**22.** The exhaustive permit requirements necessary for treatment, storage or disposal of hazardous waste are set forth in 42 U.S.C. § 6925.

**23.** Prior to 1994, courts had issued inconsistent opinions on this issue. Some courts viewed incinerator ash as being exempt from the hazardous waste provisions of the statute, *see, e.g., Environmental Defense Fund v. Wheelabrator Technologies, Inc.,* 931 F.2d 211 (2nd Cir.), *cert. denied,* 502 U.S. 974, 112 S.Ct. 453, 116 L.Ed.2d 471 (1991), while other courts determined that incinerator ash was subject to these provisions. *See, e.g., Environmental Defense Fund v. City of Chicago,* 948 F.2d 345 (7th Cir.1991), *judgment vacated,* 506 U.S. 982, 113 S.Ct. 486, 121 L.Ed.2d 426 (1992).

ous ash discharged from the facility. They maintain that the permit application required "material changes" which could only be implemented through submission to the Secretary of the Environment and amendments to Montgomery County's solid waste plan.[24] According to the plaintiffs, the ALJ failed to consider these issues at the adjudicatory hearing.

We reject the plaintiffs' contention that the refuse disposal permit was issued improperly. At the beginning of her findings, conclusions, and proposed decision, the ALJ listed the following as an issue to be resolved: "Has the site [which] applicants intend to use for disposal of the incinerator ash and noncombustibles been fully analyzed or licensed in accordance with COMAR 26.04.07.25.B(11)." The ALJ recognized that, under COMAR 26.04.07.25B(11), an applicant for a refuse disposal permit must identify a proposed site for the ash. She then pointed out that the applicants designated "Oak Landfill" in their permit application as their proposed site. As discussed above, the ALJ also accepted the applicants' representation that, in the event that the ash tested hazardous in the future, the applicants had designated an alternative landfill in which to store the ash.

In addition, the ALJ devoted eight pages of her proposed decision to a discussion of the applicants' compliance with the Montgomery County Solid Waste Plan. She first noted that, under COMAR 26.04.07.25G, the following two conditions must be met before a refuse waste disposal permit can be issued:

"(1) A statement from the appropriate local governmental agency concerning the consistency of the proposed facility

---

**24.** Relying on Code (1984, 1996 Repl.Vol.), § 9–204(e)(2), of the Environment Article, the plaintiffs claim that, in order to complete their permit applications, the applicants must "[s]ubmit to the Secretary any material change in the plans and specifications, with the reason for the change." In this case, the "material changes" included sites for the incinerator ash. Citing § 9–204(h)(2) of the Environment Article, the plaintiffs assert that before such change can be implemented, the Secretary must issue a "revised permit based on the submission to the Secretary under subsection (e)(2)."

with the approved county comprehensive solid waste management plan . . .

(2) Proof that the facility is consistent with the approved county comprehensive solid waste management plan."

The ALJ then determined that the applicants had met both of these requirements. The first requirement was satisfied by a letter attached to the application for the refuse disposal permit and signed by the Director of the Montgomery County Department of Environmental Protection.[25] The letter stated that the facility was "part of the Montgomery Solid Waste Management Plan." While refusing to review in this proceeding the County's Solid Waste Plan itself,[26] the ALJ did permit the parties to present evidence as to whether the facility complied with the plan. After a detailed review of evidence presented at the hearing by the parties on this issue, the ALJ concluded that "the weight of the evidence supports the finding that the Facility described in the Refuse Disposal Permit Application is consistent with the County's approved comprehensive solid waste management plan."

The refuse disposal permit was neither incomplete nor improper on the grounds asserted by the plaintiffs.

### F.

The plaintiffs further challenge the issuance of the permits on the ground that the incinerator would not be in

---

**25.** The ALJ noted that this requirement was also satisfied by statements made by the applicants on the face of the application for the refuse waste disposal permit that the facility was "consistent with the County Plan."

**26.** The ALJ thus stated:

"Plaintiff Walton was adamant in its determination to have the county solid waste planning policy become an issue in this proceeding. These decisions were made by the County subsequent to public hearings and enactment by the County Council. I do not have the authority to review or evaluate either the plan or its implementation. The County determines how to address its solid waste with input from the public and general oversight by MDE. In this proceeding, I do have authority to determined[sic] if the Applicants have submitted an appropriate statement and proof of consistency with the County's approved comprehensive solid waste management plan."

compliance with the more demanding air quality standards for ozone non-attainment areas under the 1990 Amendments to the federal Clean Air Act, Title I, Part D, 42 U.S.C. §§ 7502, 7503 (1994).[27] (Plaintiffs' supplemental brief at 24). The applicants, on the other hand, maintain that the 1990 Clean Air Act Amendments are not applicable to the facility at issue. (Applicants' supplemental brief at 20).

It is undisputed that issuance of the permits in this case was not in compliance with the pertinent air quality standards under the 1990 Amendments to the federal Clean Air Act. It follows that if the permits were subject to the requirements specified in §§ 7502 and 7503 of the 1990 Clean Air Act, the Department erred in issuing them.

We conclude, however, that the terms of the Clean Air Act, coupled with interpretive guidance from the EPA, indicate that the permits in question are not subject to the more rigid standards demanded under the 1990 Amendments to the Clean Air Act.[28]

Pursuant to § 7409(a) of the Clean Air Act, the EPA is directed to establish national primary and secondary ambient air quality standards for certain air pollutants which threaten the health and welfare of the Nation. 42 U.S.C. § 7409(a)(1). Congress delegated to the states the responsibility of implementing these standards through State Implementation Plans, 42 U.S.C. § 7410(a). In 1990, Congress amended the Clean Air Act to include more rigorous air quality standards which states were required to incorporate into their existing plans. At issue in this case are new source review standards, con-

---

**27.** An ozone non-attainment area is an area found, under § 107 of the Clean Air Act, 42 U.S.C. § 7407, to exceed the national primary or secondary ambient air quality standard for ozone. 42 U.S.C. § 7501(2). The National Capital Interstate Air Quality Control Region, which includes Montgomery County, has been labeled a non-attainment area for ozone for purposes of solid waste management plan preparation under 42 U.S.C. § 7511a.

**28.** Further amendments to the Clean Air Act were enacted in 1995. The 1995 Amendments do not, however, change any of the substantive questions at issue in this case.

tained in §§ 7502 and 7503, which govern sources contained in ozone non-attainment areas.

The plaintiffs argue that, pursuant to § 7401's "Effective Date of 1990 Amendment" provision, §§ 7502 and 7503 became effective on November 15, 1990, the date on which they were enacted. That provision provides as follows:

> "Except as otherwise expressly provided, the amendments made by this Act . . . shall be effective on the date of enactment of this Act [November 15, 1990]."

The new standards, however, did not immediately apply to all permits issued after November 15, 1990. Under § 7511, states were required to submit their revised plans to the EPA by November 12, 1992. *See* 42 U.S.C. § 7511. For those states which had not incorporated the new plan provisions by November 15, 1992, however, the "existing" plans would be effective and continue to govern all permit applications submitted prior to November 15, 1992.

This interpretation is consistent with that of the EPA in two guidance memoranda issued by John S. Seitz, Director of the Office of Air Quality Planning and Standards.[29] In his first memorandum, dated March 11, 1991, the Director explained that:

> "[T]he 1990 Amendments require States to submit to EPA new NSR permit program rules for ozone nonattainment areas by November 15, 1992. . . . The EPA interprets this as an expression of congressional intent not to mandate that states adhere to the more stringent . . . NSR requirements in nonattainment areas during the time provided for state implementation (SIP) development. Thus, for NSR permitting purposes in nonattainment areas, the new NSR re-

---

**29.** In these two guidance memoranda, the EPA sought to clarify the complex and significant changes made to the Clean Air Act in anticipation of numerous issues certain to be raised concerning the 1990 Amendments. In particular, the EPA anticipated that many states would not be able to incorporate the new standards into their plans by the November 15, 1992 deadline, and issued these memoranda to provide further guidance to those states.

quirements in Title I are not in effect until the States, as required by the Act, adopt NSR permit program rules to implement the Title I provisions."

Mr. Seitz further interpreted Title I of the 1990 Amendments in his September 3, 1992 memorandum:

"Title I of the 1990 CAAA requires that States with nonattainment ares or areas in the Northeast Ozone Transport Region (NOTR) submit to EPA, by specified deadlines, augmented new source permit rules which meet the amended requirement of Part D of Title I of the Act.... For ozone, the 1990 CAAA require that States submit [plans] meeting the amended Part D NSR requirements by November 15, 1992. Where States do not submit the Part D NSR [plans] by the applicable statutory deadline ... sources that have submitted complete permit applications ... by the submittal deadline may receive final permits under existing State NSR rules. In this situation, such sources will be considered by EPA to be in compliance with the Act without meeting the amended Part D NSR provisions of the 1990 CAAA [provided they meet certain requirements]...."

The EPA is the federal agency responsible for implementing the provisions of the federal Clean Air Act. As such, its interpretation of the provisions of the Clean Air Act is entitled to deference if it is "based on a permissible construction of the statute." *Chevron U.S.A. v. Natural Res. Def. Council*, 467 U.S. 837, 843–844, 104 S.Ct. 2778, 2781–2782, 81 L.Ed.2d 694, 702–704 (1984). Consistent with 1990 Clean Air Act provisions and EPA guidance, before the 1990 Amendments take effect in Maryland, the State of Maryland must, at the very least, incorporate the new regulations into its existing plan.[30]

---

**30.** The "savings clause" contained in § 110(n), 42 U.S.C. § 7410(n)(1) indicates that before the 1990 Amendments take effect, the EPA must also approve the state's revised plan. Section 110(n) reads as follows:

"Any provision of any applicable implementation plan that was approved or promulgated by the Administrator [of the EPA] pursuant to this section as in effect before November 15, 1990, shall remain in effect as part of such applicable implementation plan, except to the

Our holding is consistent with that of other courts which have decided this identical issue. *See, e.g., In the Matter of Crown/Vista Energy Project,* 279 N.J.Super. 74, 652 A.2d 212 (App.Div.), *cert. denied,* 140 N.J. 277, 658 A.2d 301 (1995). In that case, an air pollution control permit was issued by the New Jersey Department of Environmental Protection to the operator of a coal-fueled power plant for the sale of electricity. On February 28, 1992, the operator submitted an application for the permit, which the Department issued to him on October 1, 1993. A group of citizens and individuals sought review of the Department's decision on the ground that the permit was not in compliance with § 7511a of the 1990 Clean Air Act in that it did not meet the new emission standards required under that section. Analyzing the statutory scheme underlying the Clean Air Act, and citing the EPA memoranda for support, the New Jersey Court rejected the petitioners' claim that the permit, issued *after* the date of enactment of the 1990 Amendments, was subject to the more stringent emissions requirements. 652 A.2d at 216–217.

The same position was adopted by the United States District Court for the Northern District of California in *Citizens for a Better Environment v. Wilson,* 775 F.Supp. 1291, 1299 (N.D.Cal.1991). On this issue, the court in *Wilson* concluded that (775 F.Supp. at 1299):

"... Congress intended to hold agencies to [regulations contained] in existing [plans], pending formal [plan] revision. Such an interpretation best reconciles and harmonizes the purposes of the Clean Air Act and the provisions of the 1990 Amendments. It is most consistent with the overall purpose of achieving healthy air as expediously as practicable and the statutory scheme of retaining the enforceability of existing [plans] until replaced...."

In the case at bar, the applicants submitted their permit applications sometime in 1990. On November 6, 1991, the EPA designated Montgomery County as a serious ozone non-

extent that a revision to such provision is approved or promulgated by the Administrator pursuant to this chapter."

attainment area. 40 C.F.R. § 81.321. Maryland did not, however, incorporate the new plan regulations pertaining to ozone non-attainment areas until April 26, 1993. *See* COMAR 26.11.17. Accordingly, at the time that the applicants submitted their permit applications, Maryland had not yet incorporated the new regulations into its plan. Thus, the 1990 Amendments are not applicable to the permits at issue in this case.

## G.

■■■■ According to the plaintiffs, the ALJ erred in finding that "pollutant levels in water, fish, and food ... cannot be considered when determining compliance with MDE's prohibition on unreasonable endangerment under 26.11.15.06.[31]" (Plaintiffs' supplemental brief at 46). The record indicates otherwise.

As previously discussed in Part III B of this opinion, *supra,* the ALJ devoted several pages of her findings, conclusions and proposed decision to a consideration of the risks to "water fish and food" from incinerator pollutants. In particular, the ALJ considered two comprehensive risk assessments which both examined the various toxins likely to accumulate in local farm ponds and measured the resulting harm from consumption of fish within those ponds. The risk assessments also estimated the level of harm through the consumption of milk and beef from live-stock raised on local farms and from vegetables grown on those farms. Thus, the plaintiffs' argument that the ALJ "ignored food chain routes of exposure to

---

**31.** COMAR 26.11.15.06 provides, in pertinent part as follows:
 "A. Requirements for New Installations, Sources, or Premises.
 (1) Except as provided ... below, a person may not construct, modify, or operate or cause to be constructed, modified, or operated any new installation or source without first demonstrating to the satisfaction of the Department using procedures established in this chapter that total allowable emissions from the premises of each toxic air pollutant discharged by the new installation or source will not unreasonably endanger human health."

air toxins released from the incinerator" is not supported by the record.

## H.

We find no merit in the plaintiffs' final argument that "[t]he ALJ's determination that pre-hearing discovery was not permitted denied [plaintiffs] due process of law as required by the United States and Maryland Constitutions." (Plaintiffs' supplemental brief at 46). There is no provision in the Maryland Administrative Procedure Act which provides for discovery at the pre-hearing stage. Furthermore, under COMAR 26.01.02.21A, which governs the Department of the Environment contested case proceedings, "[d]iscovery may be taken only in accordance with the stipulation of the parties." Parties may, however, "request governmental documents under the Maryland Public Information Act, State Government Article, § 10–611 et. seq." COMAR 26.01.02.21B. There was no stipulation in this case providing for discovery. Consequently, the ALJ properly determined that, absent such stipulation, she was not authorized to require the extensive discovery requested by the plaintiffs. Moreover, pursuant to COMAR 26.01.02.21B, the plaintiffs requested certain documents under the Maryland Public Information Act which they received without delay. Finally, the plaintiffs do not dispute the respondents' representations that the plaintiffs were furnished with several documents.

The plaintiffs do not argue that the ALJ or the Department relied upon any document which was not previously shown to the plaintiffs, or with regard to which there was no opportunity for rebuttal. *Cf. Rogers v. Radio Shack*, 271 Md. 126, 129, 314 A.2d 113, 115 (1974) ("We agree with Rogers that under the circumstances here, with no opportunity for cross-examination or rebuttal, fundamental fairness would preclude reliance upon the report by an administrative agency"). The plaintiffs have cited no case in the Supreme Court or in this Court, and we are unaware of any such case, holding that due process mandates pre-hearing discovery in an administrative proceeding. *See, Replacement Rent–A–Car v. Smith*, 99 Md.

App. 588, 593, 638 A.2d 1217, 1219 (1994) ("The Maryland Rules relating to discovery apply only to proceedings in the circuit courts and not to proceedings before administrative agencies.... It is equally well-established that there is no broad constitutional right to pre-hearing discovery in administrative proceedings and that any general right to such discovery must come from the statutes or rules governing those proceedings. * * * Neither the State Administrative Procedure Act nor the statute governing the [agency] provides such entitlement ...."), and cases there cited.

Thus, we perceive no error in the ALJ's refusal to require pre-hearing discovery.

### IV.

For the reasons set forth in Parts II and III of this opinion, the circuit court should have affirmed the administrative decision rather than dismissing the plaintiffs' action for lack of standing.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED, AND CASE REMANDED TO THE COURT OF SPECIAL APPEALS WITH DIRECTIONS TO REVERSE THE JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AND REMAND THE CASE TO THAT COURT WITH DIRECTIONS TO ENTER A JUDGMENT AFFIRMING THE DECISION OF THE DEPARTMENT OF THE ENVIRONMENT. COSTS IN THIS COURT AND IN THE COURT OF SPECIAL APPEALS TO BE PAID BY THE RESPONDENTS.*