827 A.2d 961

Mary HANDLEY, et al.

v.

OCEAN DOWNS, LLC, et al.

No. 1013, Sept. Term, 2002.

Court of Special Appeals of Maryland.

June 27, 2003.

616

618

Thomas T. Alspach, Easton, for appellants.

Joseph A. Lynott (Lynott and Lynott, P.A., on brief), Rockville, for appellees.

Argued before KENNEY, ADKINS, RAYMOND G. THIEME, JR., (Retired, Specially Assigned), JJ.

ADKINS, J.

This appeal arises from the approval of a special use permit authorizing an off-track betting ("OTB") facility in Cambridge. In October 2001, Ocean Downs, LLC, appellee, filed an application for a special use permit with the Board of Zoning

Appeals of the City of Cambridge ("the Board"), seeking permission to operate an OTB facility in the Cambridge Plaza Shopping Center, off U.S. Route 50. After holding a public meeting, the Board approved the special use permit.

Mary Handley, Cheryl Michael, Barry Miller, and George Wheatley, Jr., appellants, all attended the Board hearing on the OTB proposal. Appellants filed a petition for judicial review of the Board's decision in the Circuit Court for Dorchester County, arguing, *inter alia*, that the Board and the Planning and Zoning Commission ("the Commission") did not follow proper procedure in reviewing and granting the permit. The circuit court affirmed the Board's determination.

In challenging the circuit court's judgment, appellants present the following issues for our review:

I. Did the Commission fail to satisfy its legal obligation to undertake a study of, and to issue a report concerning, the likely effect of the proposed special use permit?

II. Did the Commission and the Board violate Maryland's Open Meetings Act, and did the circuit court err in failing to address this issue?

III. Regarding the merits of the Board's decision,

A. Did the Board disregard its statutory obligation to consider whether conditions or safeguards should have been imposed upon the special use permit?

B. Did the Board make sufficient findings to support its decision?

C. Was the Board's decision supported by substantial evidence in the record?

We hold that the circuit court erred in failing to consider appellants' Open Meetings Act claims set forth in Issue II. Accordingly, we remand this case for the circuit court to consider whether such violations occurred and, if so, the appropriate remedy. We hold the circuit court ruled correctly on Issues I and III.

## FACTS AND LEGAL PROCEEDINGS

In early October, Ocean Downs filed its application for a special use permit authorizing the OTB facility. Thereafter, on October 18, the application was referred to the Commission for study and report. The Commission held a public hearing on the same day, notice of which was posted sometime that day in City Hall.

The Commission considered two applications at the 40 minute meeting, one of which was Ocean Downs' application. The minutes of this meeting reveal that a Department of Planning and Zoning staff member opened the discussion by explaining the location of the proposed OTB facility, its hours of operation and proposed area, and its anticipated number of employees. The staff member reported that "[a]ll necessary utilities [were] on site," and sufficient parking facilities were already in existence.

One of the Commission members questioned whether the remainder of the shopping center would be attractive to future tenants if an OTB facility was located there. Another Commission member responded that the facility would likely attract more people to Cambridge and that "he could not see where an [OTB facility] would cause another business to be run down." The Commission members also discussed the fact that the OTB facility would have to rely on outside business to be successful, and that it could not survive on local patronage alone. They commented that the City should be encouraging new businesses to establish themselves in Cambridge. The Cambridge Mayor, who was in attendance, reported that Ocean Downs had already talked with a number of businesses about moving into the shopping center. The Commission member who ultimately voted against the proposal expressed his concern that "the project looked too good to be true and ... compared it to a 'dangling carrot' and jumping at it too fast."

An audience member commented that the Commission should consider that "the majority of the existing businesses [were] not in favor of the project," out of a concern regarding

the impact of the OTB facility on their businesses. He feared that the OTB facility would "completely change the lifestyle of the community." At the conclusion of the October 18 hearing, the Commission, by a 4 to 1 margin, recommended approval of Ocean Downs' application.

On October 23, 2001, the Board convened a public hearing on Ocean Downs' application.[1] At the hearing, the City Planner described the proposed special use. He reported that the OTB facility would consist of 10,000 square feet of space, including a restaurant. Ocean Downs also requested pre-approval of a future expansion to 17,000 square feet. The facility would be open from 11:00 a.m. to 11:00 p.m., and would employ 28 people.

The City Planner also submitted to the Board the minutes of the October 18 Commission meeting, and a Department of Planning and Zoning Staff Report, which described the property.[2] He announced that the Commission had recommended approval of the special use permit by a 4 to 1 margin.

The hearing then was opened for comments, beginning with the applicant's representatives. Ocean Downs' attorney questioned William Rickman, the president of Ocean Downs, regarding the impact of the proposed OTB facility. Rickman stated that the proposed site was surrounded by property predominantly zoned C–2, or commercial. According to Rickman, there were no churches or schools within a quarter-mile of the site. There was one day care facility nearby, but it was over 1,000 feet from the proposed OTB site.

Rickman testified that his plan was to purchase the entire shopping center as a real estate investment, and then re-lease the facility. At the time of the hearing, the shopping center

---

1. The adequacy of the notice of the hearing before the Board is not at issue in this appeal, though it was contested below.

2. This "staff report" was merely a short summary of the proposed facility. It reported the zoning of the area and stated that the utility and parking infrastructure existing at the shopping center was sufficient to support the OTB facility proposed.

was only 30 percent leased. In terms of the OTB facility itself, Rickman reported that he planned to include a sit-down restaurant with a 50–person capacity. He had no plans to house slot machines in the facility.

Rickman stated that he did not recall his other OTB facilities having any detrimental effect on their respective communities. When asked by the Board how the proposed OTB facility might "impact and . . . benefit the community and the surrounding areas," Rickman responded that the facility would not "have a tremendous impact or a tremendous benefit . . . because it has the impact of a restaurant . . . or a sports bar[.]" He stated that the biggest impact would come if he was able to increase occupancy rates in the shopping center as a whole, and bring other new businesses into the area. He described this potential as a "win-win situation for both the community and for [him.]"

Rickman stated that he expected local people to make up less than 50 percent of his patrons, but that the business would draw patrons from Salisbury and Easton. He expressed doubt that he would go forward with purchasing the shopping center if the OTB facility was not approved.

Rickman then took questions from audience members. When asked whether he would recommend that the Board impose a condition on its approval of the application "that there not be any other forms of gambling in this whole property," Rickman responded that he would not object to such a condition if it were imposed county-wide, rather than just on his application. Rickman stated that he felt the OTB facility would help the community by creating jobs. Not only would the facility itself employ 28 people, Rickman contended, many more jobs would be created if he was successful in filling up the surrounding shopping center.

Many audience members expressed concern about the detrimental effects of gambling on communities. Opponents of the OTB facility introduced into the record petitions signed by over 100 county businesses that opposed the proposed OTB facility. Several opponents expressed concern about the im-

pact of gambling on children, caused by parents gambling away their paychecks. An individual from the local health system expressed concern about patients who had developed "suicidal tendencies ... due to their gambling."

One opponent, a representative of an anti-gambling advocacy group called No Casino, expressed skepticism that the Board had taken enough time to study the proposal. He also characterized OTB facilities as "open[ing] the door to slots" in Cambridge. He presented to the Board a packet of statistics compiled by the National Coalition Against Legalized Gambling, entitled *The A, B, C and Ds of Casino Gambling.* He urged the Board to consider the "facts about addictions, bankruptcies, crime, corruption and [the way gambling] devastates families[.]" According to this No Casino representative, "problems associated with addicted gamblers affect the entire community through family abuse, job neglect, embezzlement, fraud, credit card debt, bankruptcy and even suicide."

Another opponent urged the Board to keep "in the back of [its] mind" its ability to impose conditions on Ocean Downs' application, though he did not specifically propose any such conditions. He also submitted to the Board a two-year study published by the National Gambling Impact Study Commission in 1999. He specifically quoted several recommendations made as a result of that study, and questioned why no economic impact study had been performed on the proposed OTB facility.

Near the conclusion of the comment period, appellant Handley spoke.[3] She essentially summarized the concerns raised earlier in the hearing by opponents to the proposal. Her comments, like the comments of those that preceded her, clearly indicated her opposition to OTB or any gambling facility in Cambridge or Dorchester County, rather than to the specific facility proposed.

After the public comment phase of the hearing was closed, the Board had an off-the-record discussion. When the Board

---

3. None of the other appellants spoke at the October 23 hearing.

called the meeting back to order, the Board's attorney explained that, during that discussion, the Board had asked for advice regarding the applicable law governing special use permits. He announced to the audience the criteria the Board must use in determining whether to approve the application.

The Board then resumed its on-the-record deliberations. One Board member commented that it would be difficult to downgrade the area surrounding the OTB site because the shopping center already had a low percentage occupancy. Another Board member concluded that the project should go to referendum vote, due to the potentially large impact it could have on the community. At the conclusion of the meeting, the Board voted 3 to 1, with one member abstaining, to approve the special use permit.

The Board's written findings, which offered some insight into the reasons for its decision to approve the OTB facility, were filed on November 13, 2001:

> The Board listened to over three (3) hours of testimony for and against gambling in general and some comments as to off track betting in particular. Unfortunately the bulk of the testimony pertained to gambling in general not the particular proposal before the Board. Great concern was expressed over casino gambling and slot machines, matters not before the Board.

> The Board finds that the Cambridge Plaza Shopping Center and more particularly the former Rite Aid site at the shopping center is an appropriate location for the [OTB] operation. The shopping center is a commercial area (C–2 zone) and has good access (just off Rt. 50 with four lane divided highway). There is ample parking, being parking for the shopping center. There are no churches, schools, or uses sensitive to the proposed use nearby. Applicant provided this information and it was not refuted by the opposition. There was mention of a day care operation nearby but no comments directly discussing impact on the day care operation were provided.

The only comment that the location would not be appropriate was a quick comment that it shouldn't be so near the Hyatt. The Board notes that no opposition was presented by the Hyatt therefore it would appear that the issue is not of grave concern to the Hyatt management.

**The Board finds that the comments by the opposition regarding gambling in general and [off track betting] were not on point for the Board to consider.** However the extensive opposition to gambling and off track betting in general concerned one Board member to the point he abstained from voting and suggested the City Council consider a referendum on the issue.

Motion to approve the special use permit as requested. . . . Passed three to one and one abstention. (Emphasis added.)

Displeased with the Board's decision, appellants filed a petition for judicial review in the Circuit Court for Dorchester County, challenging on several grounds the Board's authorization of the special use permit. In their argument to the court, appellants asserted that (1) the Board's notice of the public hearing was deficient because it was published 14 days, rather than 15 days, before the hearing; (2) the notice of hearing before the Commission was insufficient; (3) the Commission's recommendation did not comply with the Cambridge City Code because it failed to contain a study and report on the effect of the proposed use on the comprehensive plan and property values; and (4) the Board violated the Open Meetings Act.

The circuit court affirmed the Board's decision. The court ruled that notice was adequate because appellants' presence at the public hearing demonstrated actual notice.[4] It also ruled that to bring a claim for violation of the Open Meetings Act, appellants needed to file a separate petition, and that to assert such allegations in their petition for judicial review was insuffi-

---

4. It is unclear whether the court's ruling pertained to the Board notice issue, the Commission notice issue, or both. We will discuss the import of this uncertainty later in this opinion.

cient. Regarding the adequacy of the Commission's review, the circuit court ruled that appellants had failed to meet their burden of demonstrating that the proposed special use would have an adverse impact on the community. The court ultimately held that there was sufficient evidence in the record to support the Board's decision to approve the special use permit. At the conclusion of the hearing, the court asked appellants' counsel whether it had addressed each of appellants' claims. Appellants' counsel answered in the affirmative.

## DISCUSSION

■ Before discussing the issues raised by appellants, we pause to consider Ocean Downs' challenge to appellants' standing to file this petition for judicial review. The circuit court assumed, without deciding, that appellants had standing. Without deciding whether Ocean Downs properly may assert a standing challenge before this Court when it failed to file a cross-appeal challenging the denial of its motion to dismiss for lack of standing, we hold that Miller had standing to file a petition challenging the Board's administrative action. Because Miller had standing, we need not decide whether the remaining three appellants also had standing; even assuming they lacked standing, the viability of the petition is ensured by Miller's standing. *See Bryniarski v. Montgomery County Bd. of Appeals,* 247 Md. 137, 145, 230 A.2d 289 (1967). We explain.

■ Mere presence at an administrative proceeding, without active participation, is sufficient to establish oneself as a party to the proceeding. *See Sugarloaf Citizens' Ass'n v. Dep't of Env't,* 344 Md. 271, 287, 686 A.2d 605 (1996). Ocean Downs concedes that Miller participated in the October 23 Board meeting because his signature appears on the hearing sign-in sheet.

The Cambridge City Code provides that "persons jointly or severally aggrieved by any decision of the Board of Appeals, or any taxpayer . . . of the municipality" have standing to seek judicial review of that decision. Cambridge City Code § 20–

22(a). This language mirrors that found in Md.Code (1957, 1998 Repl.Vol., 2002 Cum.Supp.), Article 66B section 4.08, which governs zoning appeals. As appellants properly assert, the Court of Appeals has interpreted this language to evidence a legislative intent to "give a taxpayer standing to appeal notwithstanding lack of aggrievement." *See Boulden v. Comm'rs of Elkton*, 311 Md. 411, 414, 535 A.2d 477 (1988).

As a Cambridge taxpayer, Miller had standing to petition for judicial review of the Board's action. *See* Cambridge City Code § 20–22(a). The record discloses that Miller filed in the circuit court, one day before the circuit court hearing, an affidavit attesting to his taxpayer status.

■ Md. Rule 7–202(c) provides that, as part of the petition for judicial review, the petitioner must "state whether [he or she] was a party to the agency proceeding. If the petitioner was not a party, the petitioner shall state the basis of the petitioner's standing to seek judicial review. No other allegations are necessary." In their petition for judicial review, the petitioners, including Miller, stated that they "were not parties to the proceedings, per se, although they offered testimony at the public hearing on [Ocean Downs' proposal] and as such are interested parties." Through this statement, the petitioners complied with Md. Rule 7–202(c). Later, when Ocean Downs challenged the petitioners' standing through a motion to dismiss, Miller filed an affidavit attesting to his status as a Cambridge taxpayer. Thus, we hold that Miller had standing to file the petition for judicial review.

## I.

### The Commission's Obligation To "Study And Report" On Impact Of Special Use Permit

■ Appellants assert that the Board's decision to grant the special use permit should be vacated because the Board failed to meet its obligations under section 20–16(b) of the Cambridge City Code. Under that section:

(b) **Before authorization of any of the special uses listed in subsection (a) of this section, the request therefore shall be referred to the City Planning and Zoning Commission for study and report concerning the effect of the proposed use on the comprehensive plan and on the character and development of the neighborhood.** A public hearing shall be held in relation thereto [5] before the [Board] notice and publication of the time and place for which shall conform to the procedure proscribed in section 20–25 for hearings and amendments. (Emphasis added.)

Subsection (a)(10) of section 20–16 specifically classifies "[s]atellite simulcast betting," as a special use or special exception use, for which the Board may grant a permit. *See* Cambridge City Code § 20–16(a)("The [B]oard ... may grant a special use permit ... for the following special uses ... which are otherwise prohibited by this chapter, and may impose appropriate conditions and safeguards to protect the comprehensive plan and to conserve and protect property and property values in the neighborhood").

Appellants assert that the Commission never undertook a study of the OTB facility, and never issued the required report.[6] Instead, they assert, the Commission engaged in "brief speculation and conjecture, of no more than a few minutes' duration, regarding whether the [proposed OTB facility] might or might not succeed." In addition, appellants argue, no request was made by the Commission to its staff for advice, no effort was made to define the bounds of the

---

**5.** According to appellants, the words "in relation thereto" in section 20–16(b) demonstrate that the very purpose of the Board meeting is to consider the "study and report" done by the Commission. We disagree. If this were the legislature's intention, it would have more clearly delineated (1) that the Commission was required to **issue** "a" study or "a" report, and would have more clearly established that the Board was to consider these documents. The words "in relation thereto" do not support appellants' argument that the Commission's duty to "study and report" was mandatory in this context.

**6.** This issue was expressly raised by an audience member at the Board's hearing.

neighborhoods that might be affected, and no contact was made with the owners of adjacent businesses.

Ocean Downs responds that the City Planner submitted a written report at the Commission hearing, describing the proposed use, hours of operation, and zoning, and concluding that the existing infrastructure could support the utility and parking needs of the proposed OTB facility. Ocean Downs additionally points out that appellants attended the Board hearing, but made no objection to the staff report, deliberations, or the form of the Commission's recommendation. Furthermore, it asserts, the word "shall" in section 20–16 is "directory, not mandatory."

We reject appellants' contention of error because we agree with Ocean Downs that the term "shall," as used in section 20–16 of the Cambridge City Code, is directory only. Thus, even assuming that the Commission failed to fulfill its duty to "study and report," such deficiency would not invalidate the Board's subsequent decision to approve the special use permit authorizing the OTB facility.

> "[I]t is well settled that the use of the words 'shall' or 'may' [is] not controlling, in determining whether a particular provision is mandatory or directory.... The question of construction turns upon the intention of the Legislature as gathered from the nature of the subject matter and the purposes to be accomplished."

> To overcome the presumption that the use of "must" makes an enactment mandatory, courts will also look to whether the enactment provides a sanction for noncompliance. **The lack of any sanction in the statute or provision tends to militate towards a finding that the statute or provision is directory.**

*Columbia Rd. Citizens' Ass'n v. Montgomery County,* 98 Md.App. 695, 701, 635 A.2d 30 (1994)(emphasis added and citation omitted); *see G & M Ross Enters., Inc. v. Bd. of License Comm'rs of Howard County,* 111 Md.App. 540, 543–45, 682 A.2d 1190 (1996)(when the word "shall" is determined to be directory, *Accardi* doctrine, which provides that agencies

" 'must scrupulously observe rules, regulations, or procedures which it has established,' " does not apply) (citation omitted).

In *Columbia Rd. Citizens' Ass'n*, a citizen's association appealed a circuit court judgment affirming the Montgomery County Board of Appeals' approval of a special exception for a nursing home in a residential area. One of the association's arguments was that the Board erred in granting the special exception without obtaining the comments of the Montgomery County Planning Board or its staff, or a statement that no review or comment was necessary, and in doing so violated a provision of the county zoning ordinance. The ordinance provided that, if an applicant wished to amend its petition prior to the hearing, the amendment "**must** . . . be referred to the planning board[.]" The ordinance further provided that, upon transmittal "the planning board or its staff **must** comment on the amendment or state that no further review and comment are necessary." *Columbia Rd. Citizens' Ass'n*, 98 Md.App. at 698–99, 635 A.2d 30 (emphasis added). In holding that the word "must" in the ordinance did not make the commenting requirement mandatory, we relied on the absence of any sanction in the ordinance for the failure to submit or consider comments.[7] *See id.* at 703, 635 A.2d 30.

Here, as in *Columbia Road Citizens' Ass'n*, the City Code has no sanction for non-compliance with this "study and report" provision governing the Commission. Accordingly, following the reasoning in *Columbia Rd. Citizens' Ass'n*, we hold that the "study and report" requirement in section 20–16 is not mandatory, but rather is directory. As such, even if the Commission, an advisory body, failed to "study and report" on the effect of the proposed OTB facility on the character and development of the neighborhood, that would not invalidate the Board's subsequent decision to approve the special use permit.

_____

**7.** In contrast, in *Lee v. Maryland Nat'l Capital Park & Planning Comm'n*, 107 Md.App. 486, 495, 668 A.2d 980 (1995), the Montgomery County zoning ordinance specifically defined the term "shall" as mandatory. The word "shall" is not explicitly defined in the relevant sections of the Cambridge City Code.

## II.

### Open Meetings Act Violations

Maryland's Open Meetings Act ("the Act") is codified in Md.Code (1984, 1999 Repl.Vol.), section 10–501 *et seq.* of the State Government Article ("SG"). It applies to "public bodies," a class to which both the Commission and the Board belong.[8] *See* SG § 10–502(h).

The Act embodies the philosophy that public business should be performed in a public manner, accessible to interested citizens, and that this type of open government is "essential to the maintenance of a democratic society." SG § 10–501(a). Such open government "ensures the accountability of government to the citizens of the State[,] . . . increases the faith of the public in government and enhances the effectiveness of the public in fulfilling its role in a democratic society." *See* SG § 10–501(b). As such,

[e]xcept in special and appropriate circumstances when the meetings of public bodies may be closed under this subtitle, it is the public policy of the State that the public be provided with adequate notice of the time and location of meetings of public bodies, which shall be held in places reasonably accessible to individuals who would like to attend these meetings.

SG § 10–501(c). The Court of Appeals has commented that this legislative policy "undergirds and pervades the Act and necessarily sets the general direction for its interpretation." *See Wesley Chapel Bluemount Ass'n v. Baltimore County,* 347 Md. 125, 128, 699 A.2d 434 (1997).

### Alleged Violations

Appellants raise a number of challenges based on violations of the Act. First, appellants assert that, because notice of the

---

8. The Act specifically applies to public bodies that meet to consider "any . . . zoning matter," including a special exception. *See* Md.Code (1984, 1999 Repl.Vol.), § 10–503(b)(2) of the State Government Article ("SG").

Commission hearing was not posted in City Hall until the day of that hearing, the Commission violated SG section 10–506(a), which requires a public body to "give reasonable advance notice of the session" in writing.

Second, appellants assert that the Board violated SG section 10–508 in several ways by conferring off-the-record during the October 23 public hearing. SG section 10–508(a) permits public bodies to "meet in closed session or adjourn an open session to a closed session" only to undertake one of 14 specific actions set forth in that subsection. To close a session, the statute requires that "a majority of the members of a public body present and voting vote in favor of closing the session[.]" SG § 10–508(d)(1). The Act also provides:

(2) Before a public body meets in closed session, the presiding officer shall:

(i) conduct a recorded vote on the closing of the session; and

(ii) make a written statement of the reason for closing the meeting, including a citation of the authority under this section, and a listing of the topics to be discussed.

(3) If a person objects to the closing of a session, the public body shall send a copy of the written statement required under paragraph (2) of this subsection to the Board.

(4) The written statement shall be a matter of public record.

SG § 10–508(d). Appellants assert that the Board wholly disregarded its obligations under section 10–508 by closing the public hearing without first voting to close it, and by failing to make a written statement explaining its reasons for closing the hearing. They also assert that the Board violated SG section 10–509 by not taking minutes of what was discussed during its off-the-record conference.

The trial court did not rule on these alleged violations because it decided that they were not properly raised in the

manner required by the Act.[9] Because we disagree with this holding, we shall remand the case to the trial court to consider these alleged violations. We explain below.

## Time And Method Of Enforcement Of The Act

■ Section 10–510, entitled "Enforcement," authorizes an aggrieved party to file a petition in the circuit court alleging Open Meetings Act claims. Although several reported decisions in Maryland interpret the Open Meetings Act and its provisions, none addresses whether the "petition" authorized by section 10–510 is the sole manner in which to bring an Open Meetings Act challenge. Contending that a section 10–510 petition is the exclusive means for enforcement, Ocean Downs argues that a party seeking to pursue a claim for violation of the Act in circuit court must: (1) file it as a

---

9. The court, however, did address appellants' notice issues. Appellants' primary notice challenge before the circuit court involved the sufficiency of its notice regarding the Board hearing, rather than the Commission hearing, though it did at least raise the Commission notice issue. At the circuit court proceeding, appellants' attorney stated:

> Your Honor, ... it is true that the appellants ... were at the hearing. Our concern is with the individuals whom that notice requirement— both the notice for the ... Commission meeting and the notice of the Board ... meeting ... is supposed to protect ... are the people who didn't get it. No one got notice of the ... Commission [meeting] unless you happen to walk by the door that day. So, we don't know how many other people are out there who could have been at that hearing and could have given testimony that ... could have affected the outcome[.]

We think the record is ambiguous as to whether appellants' attorney was referring to the October 23 Board hearing, or the October 18 Commission meeting, when he conceded that his clients "were at the hearing." It is equally ambiguous whether the circuit court was referring to the Board hearing, the Commission meeting, or both, when it ruled that "the people who were there cannot be heard to complain about the adequateness of the notice. They had actual notice. They were there." On remand, the circuit court shall reexamine this issue along with the other Open Meetings Act claims, and make a specific finding as to whether appellants had actual notice of the **Commission** meeting. If they had actual notice of the Commission meeting, they also had adequate notice as a matter of law. *See Clark v. Wolman*, 243 Md. 597, 600, 221 A.2d 687 (1966)("notification purposed to inform may be replaced by actual knowledge")(emphasis omitted).

separate petition pursuant to section 10–510, and (2) file it within the 45 days called for in section 10–510.

Section 10–510(b) "authorize[s]" an aggrieved party to file in the circuit court a petition asserting a violation of the Act:

(b) *Petition authorized.*—(1) If a public body fails to comply with § 10–505, § 10–506, § 10–507, § 10–508, or § 10–509(c) of this subtitle and a person is affected adversely, the person **may** file with a circuit court that has venue a petition that asks the court to:

(i) determine the applicability of those sections;

(ii) require the public body to comply with those sections; or

(iii) void the action of the public body. (Bold emphasis added.)

Section 10–510(b) petitions are subject to a 45–day limitations period:

(2) If a violation of § 10–506, § 10–508, or § 10–509(c) of this subtitle is alleged, the person shall file the petition within 45 days after the date of the alleged violation.
(3) If a violation of § 10–505 or § 10–507 of this subtitle is alleged, the person shall file the petition within 45 days after the public body includes in the minutes of an open session the information specified in § 10–509(c)(2) of this subtitle.

Appellants argue that, while section 10–510(b) **authorizes** the filing of a separate petition raising Open Meetings Act claims, it does not **require** that practice. They rely on the limiting language in section 10–510(a)(3), specifying that the section "does not affect or prevent the use of any other available remedies." Asserting that other remedies are available, appellants contend that "in order to eliminate needlessly redundant filings," they have consolidated, and seek a remedy for, "their claims of procedural irregularities by the [Commission and Board], as well as open meeting law violations by those agencies, in one appeal."

We agree with appellants that this "other available remedies" language evidences the legislature's intent that a petition

under section 10–510 is not the exclusive remedy for an Open Meetings Act violation, and that alleged violations may be raised in the course of a petition for judicial review of an agency's decision. *See Breitenbach v. N.B. Handy Co.,* 366 Md. 467, 473, 784 A.2d 569 (2001)(plain language of statute is best evidence of legislative intent). If our interpretation were otherwise, the legislative reservation of all "other available remedies" would be a nullity, and the statutory language would be superfluous. *See Taylor v. NationsBank, N.A.,* 365 Md. 166, 181, 776 A.2d 645 (2001)("whenever possible, [a] statute should be read so that no word, clause, sentence or phrase is rendered superfluous or nugatory"). Nothing in section 10–510, moreover, prohibits a party from raising Open Meetings Act claims as part of a petition for judicial review, rather than taking advantage of the optional section 10–510(b) remedy.

The legislative history of this "other available remedies" language also supports our interpretation. The Open Meetings Act was originally enacted in 1977 as Senate Bill 493. The session law reveals that the following amendment was made to the "other available remedies" provision before the bill's passage:

> The provisions of this section do not ~~effect~~ *affect* or preclude the application of any other available remedies ~~under the Administrative Procedures Act, the Declaratory Judgment Act, or any other applicable remedies.~~

1977 Md. Laws, ch. 863. This amendment was made by the Senate Committee on Constitutional and Public Law during its first reading of the draft bill. Although there is nothing in the bill file that explains why this change was made, we presume that the Committee thought that a less specific version would ensure a broader application, and avoid potential *ejusdem generis* interpretations that might preclude certain remedies not specifically named. *See In re Wallace W.,* 333 Md. 186, 190, 634 A.2d 53 (1993)(*ejusdem generis* is "based on 'the supposition that if the legislature had intended the general words to be construed in an unrestricted sense, it would not

have enumerated the specific things' ") (citation omitted); *Giant of Md., Inc. v. State's Att'y for Prince George's County,* 274 Md. 158, 167, 334 A.2d 107 (1975)(under doctrine of *ejusdem generis,* "when general words in a statute follow the designation of particular things or classes of subjects or persons, the general words will usually be construed to include only those things or persons of the same class or general nature as those specifically mentioned").

This interpretation is consistent with the broad legislative policy to "ensur[e] the accountability of government and increas[e] the faith of the public in government [that] undergirds and pervades the Act." *Wesley Chapel,* 347 Md. at 128, 699 A.2d 434. The Open Meetings Act effectively delegates to the public the enforcement of the Act. *See* SG § 10–502.4 (establishing duties of State Open Meetings Law Compliance Board, which direct Board to "receive, review and resolve complaints," but creating no investigatory or prosecutorial arm to identify or prosecute complaints); SG § 10–511 (establishing limited civil penalty of $100; no criminal penalty).

To interpret section 10–510 as restricting the time period for raising Open Meeting Act violations to a period within 45 days of the violation would significantly curtail the public's right of enforcement. A 45 day window seems especially restrictive when one considers a litigant's normal inclination to follow the standard procedure of deferring pursuit of circuit court remedies until after a final adverse agency decision. This inclination, of course, arises from the firmly entrenched doctrine requiring exhaustion of administrative remedies. *See, e.g., Moose v. Fraternal Order of Police,* 369 Md. 476, 487, 800 A.2d 790 (2002)(in cases involving administrative agency actions, all administrative remedies must be exhausted before a party may seek a declaratory judgment in circuit court). Moreover, that inclination is reinforced by the "any other available remedies" language in section 10–510(a)(3). We see nothing in the Act that calls for such a narrow construction of the public's right to enforce this important statute.[10]

---

10. To interpret section 10–510(b) to require a citizen to file, in every case, a separate petition asserting Open Meetings Act violations would

Our decision rests, in part, on our view that, in specifically providing for the section 10–510(b) remedy, the legislature's focus was on **timely** enforcement of the Act. Without section 10–510(b), a person aggrieved by an Open Meetings Act violation would be frustrated in efforts to obtain timely judicial review by the requirement that he first obtain a final agency decision on the merits. *See id.* at 487, 800 A.2d 790. In section 10–510(b), the legislature provided a mechanism through which a party who observed an Open Meetings Act violation **before** the final agency decision was handed down "may" petition the court to correct that violation or wrong, before the final agency action. Such correction might include, for example, issuing an injunction against a continuing or further violation pursuant to section 10–510(d)(2).

Because we do not read the statute to restrict Open Meetings Act claims to those made pursuant to section 10–510(b), we reject Ocean Downs' argument that appellants' Open Meetings Act claims are barred because appellants did not file their memorandum in support of their petition for judicial review, which first raised the Open Meetings Act violations, until more than 45 days after the alleged Open Meetings Act violations occurred.[11] If the claim is made with a petition for judicial review, rather than under section 10–510(b), then the 45 day limit, which is part of 10–510(b), simply does not apply. The

also place the needless financial burden of paying two sets of filing fees on those citizens seeking both judicial review of an agency action and enforcement of the Act. Appellants were required to pay $100 in filing and attorney appearance fees in order to file their petition for judicial review alone. If appellants were required to file a separate section 10–510(b) petition to raise their Open Meetings Act claims, they likely would have been required to pay another $100 in fees to do so. This is a significant sum of money for the average citizen.

11. Although appellants filed their petition for judicial review on November 21, 2001, less than 45 days after the October 23 public hearing before the Board during which most of the alleged Open Meetings Act violations occurred, appellants did not file their memorandum raising their Open Meetings Act challenge until December 28, more than 45 days after the October 23 Board hearing.

plain language of the Act supports this conclusion. If it had intended that the 45–day limitation apply to all Open Meetings Act claims, the legislature (1) would have used broader language (*e.g.,* a party "shall file a claim based on a violation of this Act within 45 days of such violation"), and (2) would have set forth this limitation in a context independent of section 10–510(b). *Cf. Andy's Ice Cream, Inc. v. City of Salisbury,* 125 Md.App. 125, 134–36, 724 A.2d 717, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999)(Open Meetings Act claims considered although filed more than 45 days after "alleged violation").

■ Accordingly, we hold that appellants timely raised their Open Meetings Act claims in their petition for judicial review of the agency action. Because the circuit court made no factual findings as to whether the Act was violated by the Commission and the Board, and if so, what remedies were appropriate, we remand the case to the circuit court for these determinations.[12]

---

**12.** The circuit court is authorized to dispense a wide range of sanctions to remedy any Open Meetings Act violation it finds. *See* SG § 10–510(d). The circuit court may:

 (1) consolidate a proceeding under this section with another proceeding under this section or an appeal from the action of the public body;

 (2) issue an injunction;

 (3) determine the applicability of this subtitle to the discussions or decisions of public bodies;

 (4) if the court finds that a public body willfully failed to comply with § 10–505, § 10–506, § 10–507, or § 10–509(c) of this subtitle and that no other remedy is adequate, declare void the final action of the public body;

 (5) as part of its judgment:

 (i) assess against any party reasonable counsel fees and other litigation expenses that the party who prevails in the action incurred; and

 (ii) require a reasonable bond to ensure the payment of the assessment; and

 (6) grant any other appropriate relief.

SG § 10–510(d).

## III.

## The Substantive Validity Of The Board's Decision To Approve The Special Use Permit

If the circuit court concludes that there were Open Meetings Act violations, and they were grievous enough, it has the authority to remedy those violations with an action as severe as voiding the Board's decision. Before doing so, however, it must determine that the Board "willfully failed to comply" with the Act, and that no other remedy is adequate. *See* SG § 10–510(d)(4); *Wesley Chapel,* 347 Md. at 128–29, 699 A.2d 434. Although the remaining issues raised by appellants would become moot if the trial court vacated the Board's decision because of an Open Meetings Act violation,[13] we will address them because the trial court did so. *See* Rule 8–131(a); *Mitchell v. Montgomery County,* 88 Md.App. 542, 547, 596 A.2d 93 (1991)(though appellate court reversed judgment, it went on to "address several of [the appellant's] other arguments which [were] likely to arise on retrial").

■ Our standard of review is the familiar "substantial evidence" test. When there is evidence from which reasonable persons could draw different conclusions, we defer to the decision of the administrative body if there is substantial evidence to support it. *See White v. North,* 356 Md. 31, 44, 736 A.2d 1072 (1999).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." The heart of the fact finding process often is the drawing of inferences from the facts. The administrative agency is the one to whom is committed the drawing of whatever inferences reasonably are to be drawn from the factual evidence. "The Court may not substitute its judgment on the question whether the inference drawn is the

---

**13.** We do not decide here whether the evidence in this record about the alleged Open Meetings Act violations would support a finding of wilfulness or a conclusion that no other adequate remedy existed.

right one or whether a different inference would be better supported. The test is reasonableness, not rightness."

*Snowden v. Mayor and City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390 (1961) (citations omitted). The decision of an administrative board is owed no deference, however, when it is based on erroneous legal conclusions. *See Stansbury v. Jones,* 372 Md. 172, 184, 812 A.2d 312 (2002).

Before addressing these remaining issues, we shall review as background the unique nature of special exception uses, and the standards governing an administrative board's consideration of such uses.

## A.

### The Unique Nature Of Special Exception Uses

 We are asked to review the Board's decision to approve Ocean Downs' special use permit, authorizing the OTB facility. By classifying a given use as a special exception use, the legislature, in essence, established a presumption that the use is consistent with the general welfare. A special exception use "in a zoning ordinance recognizes that the legislative body of a representative government has made a policy decision for all of the inhabitants of the particular governmental jurisdiction, and that the ... use is desirable and necessary in its zoning planning provided certain standards are met." *Mossburg v. Montgomery County,* 107 Md.App. 1, 7–8, 666 A.2d 1253 (1995).

 In light of this presumption of validity, the administrative board's sole duty in reviewing an application for such a special exception use is "to judge whether the neighboring properties in the general neighborhood would be adversely affected and whether the use **in the particular case** is in harmony with the general purpose and intent of the plan." *Schultz v. Pritts,* 291 Md. 1, 11, 432 A.2d 1319 (1981)(emphasis added). Put differently, the reviewing body must decide:

whether there are facts and circumstances that show that the particular use proposed at the particular location pro-

posed would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone.

*Id.* at 15, 432 A.2d 1319.

■■■ Only when a proposed special exception use will have "an adverse effect above and beyond that ordinarily associated with such uses," must the administrative board deny the use. *See id.* at 21, 432 A.2d 1319. When the proposed use would create a substantially similar effect if it were located elsewhere within the same zone, the adverse impact is not sufficiently unique to justify denial of the application. *See, e.g., Anderson v. Sawyer,* 23 Md.App. 612, 625, 329 A.2d 716 (1974)(application to locate funeral home in residential zone could not be denied because opponents presented neither facts nor reasons that it would "affect adjoining and surrounding properties in any way other than [those that] result from the location of any funeral home in any residential zone").

■■■ Thus, the applicant in a special exception situation has only a limited evidentiary burden.

Whereas, the applicant has the burden of adducing testimony which will show that his use meets the prescribed standards and requirements, he does not have the burden of establishing affirmatively that his proposed use would be a benefit to the community. If he shows to the satisfaction of the Board that the proposed use would be conducted without real detriment to the neighborhood and would not actually adversely affect the public interest, he has met his burden. The extent of any harm or disturbance to the neighboring area and uses is, of course, material. . . . [I]f a requested special exception use is properly determined to have an adverse effect upon neighboring properties in the general area, it must be denied.

*Schultz,* 291 Md. at 11–12, 432 A.2d 1319.

With these principles in mind, we consider appellants' remaining contentions of error.

## B.

## Application Of Special Exceptions Principles

 All of the opposition's testimony regarding the potentially detrimental effects of gambling on the community did no more than indicate that the proposed OTB facility would have the same impact on the community as any OTB facility. The transcript of the October 23 public hearing demonstrates that the opposition did not object to the location of **this** OTB facility specifically—rather; the opposition was not supportive of **any** OTB facility, located **anywhere,** within their community. As such, the opposition failed to negate the presumption, generated by the legislature's inclusion of "satellite simulcast facilities" as approved special exception uses in the City Code, that the OTB facility would be in the "interest of the general welfare." *See id.*

One particular excerpt from the Board hearing illustrates this point well. Near the end of the commenting period, the Board's attorney specifically asked one of the more vocal members of the opposition whether he had any comments regarding the specific location proposed in Ocean Downs' permit application. That individual tellingly responded, "I don't think this is an appropriate site. **I don't think there's another one in Cambridge or Dorchester County.**" (Emphasis added.) He suggested that it was unwise to locate an OTB facility in such close proximity to the new Hyatt resort that was scheduled to open in Cambridge the following spring. He also suggested, with no elaboration, that "there are better uses for that property than gambling[.]" These comments are reflective of the tone of the entire opposition.

Appellants failed to negate the presumption that "the [proposed OTB facility] would have any adverse effects above and beyond those inherently associated with such a special exception use irrespective of its location within the zone." *See id.* at 15, 432 A.2d 1319. Accordingly, the Board properly approved Ocean Downs' special use permit application, and the circuit court committed no error in upholding that decision.

Appellants suggest that the Board's decision must be voided because the Board's " 'findings' ... fail[ed] to identify the 'neighborhood' under consideration, and ma[de] no reference to the comprehensive plan or to a factual basis for concluding that property and property values in the neighborhood [would] not be affected by the proposal."

Although evidence of the impact of a special exception use on the neighboring properties is relevant to determining whether the use causes an extraordinary impact on them, appellants have failed to present us with any authority for the proposition that the Board, in considering a special exception, must explicitly define the neighborhood, and our research has uncovered none. The cases that have reversed zoning boards for a failure to define the neighborhood have all involved the "change in conditions" portion of the "change or mistake" rule that is applied in piecemeal zoning cases. *See* Stanley D. Abrams, *Guide To Maryland Zoning Decisions* § 1.4 (3d ed.1992, 2000 Cum.Supp.)(collecting cases). Unlike special exception uses, which are presumptively valid, piecemeal changes in zoning are presumptively invalid, as "it is presumed that the original zoning was well planned." *Wakefield v. Kraft*, 202 Md. 136, 141, 96 A.2d 27 (1953), *superceded by statute on other grounds by Mayor & Council of Rockville v. Rylyns Enters.*, 372 Md. 514, 814 A.2d 469 (2002). *Accord Stratakis v. Beauchamp*, 268 Md. 643, 652, 304 A.2d 244 (1973)(no principle "is more rudimentary than the strong presumption of correctness of original zoning and of comprehensive rezoning"). The applicant may only overcome this presumption by producing "strong evidence of mistake in the original zoning or comprehensive rezoning or evidence of substantial change in the character of the neighborhood[.]" *Stratakis*, 268 Md. at 652, 304 A.2d 244 (emphasis omitted).

Moreover, the record indicates that the Board did consider the neighborhood in its deliberations. In its written findings, the Board noted that the surrounding property was zoned commercial. It also found that there were "no churches, schools, or uses sensitive to the proposed use nearby." While

it recognized that there was a daycare facility located nearby, it found that "no comments directly discussing impact on the day care operation were provided." It also concluded that there was no evidence to back up the generalized contention by one opposition member that the proposed OTB facility might negatively impact the Hyatt. All of these comments demonstrate that the Board considered the impact of the proposed use on the comprehensive plan and the neighboring properties. These findings were sufficient to show that the Board properly considered whether the **particular location of the proposed OTB facility** would have an effect "above and beyond that ordinarily associated with such use[.]" *Schultz,* 291 Md. at 21, 432 A.2d 1319. There was substantial evidence in the record to support the Board's decision, and we will not disturb it.

## C.

### The Board's Failure To Impose Conditions On Its Approval Of The Special Use Permit

 Appellants argue that the Board disregarded its statutory obligation to consider whether conditions or safeguards should have been imposed upon the special use permit before its approval. The whole purpose of such conditions or safeguards is "to protect the comprehensive plan and to conserve and protect property and property values in the neighborhood[.]" *See* Cambridge City Code § 20–16(a). Because there was no evidence before the Board that the proposed use would have a unique impact on the comprehensive plan or neighboring properties, there was no reason for the Board to consider imposing conditions on its approval of the permit.

 Appellants also challenge the "findings" filed by the Board after the October 23 hearing. They contend that "[ t]here is no evidence of when these alleged 'findings' ever were discussed or adopted by the [Board], or executed by its chairman." Appellants, however, failed to challenge the legitimacy of the Board's written findings before the circuit court. Therefore, we shall not address this contention on appeal. *See*

Md. Rule 8–131(a); *Elliott v. Scher, Muher, Lowen, Bass, Quartner, P.A.*, 114 Md.App. 334, 338, 689 A.2d 1289 (1997).

JUDGMENT VACATED AND CASE REMANDED TO CIRCUIT COURT FOR DORCHESTER COUNTY FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION; COSTS TO BE PAID½ BY APPELLANTS AND ½ BY OCEAN DOWNS.